**Slip Op. 02-118**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                           :
LUOYANG BEARING FACTORY,                   :
                                           :
          Plaintiff and                    :
          Defendant-Intervenor,            :
                                           :
          v.                               :   Consol. Court No.
                                           :   99-12-00743
UNITED STATES,                             :
                                           :
          Defendant,                       :
                                           :
          and                              :
                                           :
THE TIMKEN COMPANY,                        :
                                           :
          Defendant-Intervenor            :
          and Plaintiff.                    :
_____:


        This consolidated action concerns the claims raised by
plaintiff and defendant-intervenor, Luoyang Bearing Factory
("Luoyang"), and defendant-intervenor and plaintiff, The Timken
Company ("Timken"), who move pursuant to USCIT R. 56.2 for judgment
upon the agency record challenging the Department of Commerce,
International Trade Administration's ("Commerce") final
determination, entitled <u>Final Results of 1997-1998 Antidumping Duty
Administrative Review and Final Results of New Shipper Review of
Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,
From the People's Republic of China</u> ("<u>Final Results</u>"), 64 Fed. Reg.
61,837 (Nov. 15, 1999).

        Specifically, Luoyang contends that Commerce erred in
selecting, for valuing the bearing quality steel bar used to
manufacture tapered roller bearings ("TRBs") cups and cones, export
data from Japan to India, rather than reviewing and using People's
Republic of China ("PRC") trading company import data.

        Timken contends that Commerce erred in: (1) including
"consumption of traded goods" in Indian bearing producers' direct
input costs when calculating the overhead, selling, general and

administrative expenses ("SG&A") and profit rates; (2) selecting, for valuing PRC labor costs, the wage rates in Chapter 5 of the International Labor Office's ("ILO") 1998 Yearbook of Labor Statistics ("1998 Yearbook") rather than the labor costs reported in Chapter 6A of the ILO's 1998 Yearbook; (3) valuing certain steel inputs by using the price paid by a PRC bearing producer to a market-economy supplier; and (4) excluding the annual report data of the National Engineering Company ("NEI") in Commerce's determination of overhead, SG&A and profit rates.

**Held:** Luoyang's 56.2 motion is granted.  Timken's 56.2 motion is granted in part and denied in part.  This case is remanded to Commerce to: (1)(a) examine whether or not the PRC trading company import prices constitute the "best available information" to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and used by Luoyang in the manufacture of TRB cups and cones and, if Commerce concludes that the PRC trading company import prices present the "best available information" for the purpose of such surrogate evaluation, to recalculate Commerce's determination not inconsistent with this opinion; and (b) examine if, and only if, Commerce finds that the PRC trading company import prices do not constitute the "best available information," whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones, and to explain, (if Commerce finds that export data from Japan to India is the "best available information,") how the entire export data from Japan to India falls within the range of values in the United States category benchmark range; (2) exclude "consumption of traded goods" from Commerce's overhead, SG&A and profit rate calculations and to recalculate the dumping margins accordingly; and (3) (a) explain, with reference to the record, whether or not the PRC bearing producer's import data at issue was "meaningful"; and (b) provide the Court with an explanation as to why the PRC trading company data is not the "best available information" for the purpose of valuing either the entire factor of production ("FOP") (that is, both the directly imported FOP and the non-market economy country ("NME") sourced FOP) or the NME sourced FOP.  Commerce's final determination is affirmed in all other respects.

[Luoyang's 56.2 motion is granted.  Timken's 56.2 motion is granted in part and denied in part.  Case remanded.]

Dated:    October 1, 2002

Hume & Associates, PC (Robert T. Hume and Stephen M. De Luca) for Luoyang, plaintiff and defendant-intervenor.[1]

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau); of counsel: Rina Goldenberg, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

Stewart and Stewart (Terence P. Stewart, Geert De Prest, Wesley K. Caine and Amy S. Dwyer) for Timken, defendant-intervenor and plaintiff.

**OPINION**

**TSOUCALAS, Senior Judge:** This consolidated action concerns the claims raised by plaintiff and defendant-intervenor, Luoyang Bearing Factory ("Luoyang"), and defendant-intervenor and plaintiff, The Timken Company ("Timken"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of 1997-1998 Antidumping Duty Administrative Review and Final Results of New Shipper Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Final Results"), 64 Fed. Reg. 61,837 (Nov. 15, 1999).

---

[1] On January 26, 2000, this Court granted Luoyang's Consent Motion For Intervention but Luoyang has not filed any briefs as a defendant-intervenor in this action.

Specifically, Luoyang contends that Commerce erred in selecting, for valuing the bearing quality steel bar used to manufacture tapered roller bearings ("TRBs") cups and cones, export data from Japan to India, rather than reviewing and using People's Republic of China ("PRC") trading company import data.

Timken contends that Commerce erred in: (1) including "consumption of traded goods" in Indian bearing producers' direct input costs when calculating the overhead, selling, general and administrative expenses ("SG&A"), and profit rates; (2) selecting, for valuing PRC labor costs, the wage rates in Chapter 5 of the International Labor Office's ("ILO") 1998 Yearbook of Labor Statistics ("1998 Yearbook") rather than the labor costs reported in Chapter 6A of the ILO's 1998 Yearbook; (3) valuing certain steel inputs by using the price paid by a PRC bearing producer to a market-economy supplier; and (4) excluding the annual report data of the National Engineering Company ("NEI") in Commerce's determination of overhead, SG&A and profit rates.

## BACKGROUND

This case concerns the antidumping duty order on TRBs and parts thereof, finished and unfinished, from the PRC for the period

of review ("POR") covering June 1, 1997, through May 31, 1998.[2]
See <u>Final Results</u>, 64 Fed. Reg. at 61,837.  On July 8, 1999,
Commerce published the preliminary results of the subject review.
See <u>Preliminary Results of 1997-1998 Antidumping Duty
Administrative Review and Partial Recission of Antidumping Duty
Administrative Review of Tapered Roller Bearings and Parts Thereof,
Finished and Unfinished, From the People's Republic of China</u>
("<u>Preliminary Results</u>"), 64 Fed. Reg. 36,853.  Commerce published
the <u>Final Results</u> on November 15, 1999.  <u>See</u> <u>Final Results</u>, 64 Fed.
Reg. 61,837.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19
U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in
an antidumping administrative review, the Court will uphold
Commerce's determination unless it is "unsupported by substantial

---

[2] Since the administrative review at issue was initiated after
December 31, 1994, the applicable law is the antidumping statute as
amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No.
103-465, 108 Stat. 4809 (1994) (effective January 1, 1995).  <u>See</u>
<u>Torrington Co. v. United States</u>, 68 F.3d 1347, 1352 (Fed. Cir.
1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA
amendments)).

evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).


## I.    Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.  __Chevron__ Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'"  Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.  Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter."  Id. (citations omitted).  Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of <u>Chevron</u>, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. <u>See</u> <u>Chevron</u>, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. <u>See</u> <u>Fujitsu Gen. Ltd. v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. <u>See</u> <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); <u>see also</u> <u>IPSCO, Inc. v. United States</u>, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." <u>Negev Phosphates, Ltd. v. United States</u>, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. <u>See</u> <u>Mitsubishi Heavy Indus. v. United States</u>, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

**DISCUSSION**

I.   **Commerce's Selection of Export Data from Japan to India as a Surrogate Value for Bearing Quality Steel Bar Used by a PRC Producer to Manufacture TRB Cups and Cones**

    **A.   Background**

        **1.   Statutory Background**

An antidumping margin is the difference between normal value ("NV") and United States price of the merchandise.  When the merchandise is produced in a non-market economy country ("NME") such as the PRC, Commerce constructs NV pursuant to section 1677b(c), which provides that

> the valuation of the factors of production shall be based on <u>the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]</u>.

19 U.S.C. § 1677b(c)(1) (1994) (emphasis supplied).


The statute does not define the phrase "best available information," it only provides that

> [Commerce], in valuing factors of production . . . , shall utilize, to the extent possible, the prices or costs of factors of production in <u>one or more market economy countries</u> that are--
>
>     (A) at a level of economic development comparable to that of the nonmarket economy country, and
>     (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4) (1994) (emphasis supplied).

     Thus, the statute grants to Commerce broad discretion to determine the "best available information" in a reasonable manner on a case-by-case basis.  See Lasko Metal Prods., Inc. v. United States ("Lasko"), 43 F.3d 1442, 1446 (Fed. Cir. 1994) (noting that the statute "simply does not say--anywhere--that the factors of production must be ascertained in a single fashion.") Consequently, Commerce values as many factors of production ("FOPs") as possible using information obtained from the "primary" surrogate country, that is, the country that Commerce considers to be most comparable in economic terms to the NME country being investigated, and that also produces merchandise comparable to the subject merchandise.  See, e.g., Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 940-41, 806 F. Supp. 1008, 1018 (1992); Timken Co. v. United States, 16 CIT 142, 143-44, 788 F. Supp. 1216, 1218 (1992).  Additionally, if Commerce determines that suitable values cannot be obtained from the data of the primary surrogate country, Commerce resorts to the data from the second, and sometimes the third, surrogate.  See, e.g., Timken Co. v. United States ("Timken 2001"), 25 CIT __, __, 166 F. Supp. 2d 608, 621-23 (2001); Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China, 59 Fed. Reg. 55,625, 55,629 (Nov. 8, 1994); Final Determination of Sales at Less Than Fair Value: Certain Helical

Spring Lock Washers From the People's Republic of China, 58 Fed.

Reg. 48,833, 48,835 (Sept. 20, 1993).

### 2.    Factual Background

During this review, Commerce initially chose secondary

surrogate data (that is, export data from Japan to Indonesia) over

data from the primary surrogate country (that is, India) to value

bearing quality steel bar used by Luoyang, a PRC producer, in the

manufacturing of TRB cups and cones.[3]  See Preliminary Results, 64

Fed. Reg. at 36,856; see also Def.'s Mem. Opp'n Luoyang's Mot. J.

Agency R. ("Def.'s Mem. Opp'n Luoyang"), App. Ex. 4.   In the

Preliminary Results, Commerce also determined that it would use

export data from Japan to Indonesia to value the steel bar

purchased by Luoyang from a PRC trading company rather than that

"trading company['s] prices." Preliminary Results, 64 Fed. Reg. at

36,856.

Commerce explained that in order to value the steel bar used

by Luoyang to manufacture TRB cups and cones, Commerce compared

---

[3]  "To make cups and cones, Luoyang used both domestic and imported hot-rolled[,] [that is, bearing quality] steel bar.  The imported steel bar was imported from a market economy country for Luoyang by a [PRC] trading company."  Pl.'s Mem. P. & A. Supp. Rule 56.2 Mot. J. Agency R. ("Luoyang's Mem.") at 5 (emphasis supplied); see also Def.'s Mem. Opp'n Luoyang's Mot. J. Agency R. ("Def.'s Mem. Opp'n Luoyang") at 3-5 (citing Def.'s Mem. Opp'n Luoyang, Proprietary App. Exs. 1, 2, and 4).

several data sources (including: (1) Indian import statistics; (2) export data from Japan to India; (3) Indonesian import statistics; and (4) export data from Japan to Indonesia) to the United States import statistics for the Harmonized Tariff Schedule ("HTS") category which "isolates bearing quality steel used in the production of cups and cones and has been used for comparison purposes in past reviews." Def.'s Mem. Opp'n Luoyang, App. Ex. 4 at 4 (citing Final Results of 1996-1997 Antidumping Duty Administrative Review and New Shipper Review and Determination Not To Revoke Order in Part of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("10th Annual Review"), 63 Fed. Reg 63,842, 63,845 (Nov. 17, 1998)). Commerce reasoned that it decided to use export data from Japan to Indonesia to value steel bar used in the production of TRB cups and cones over import data from India because Commerce determined that steel values contained in the Indian import data were not reliable for two reasons: (1) Commerce was unable to isolate Indian import value for bearing quality steel used to manufacture the merchandise at issue; and (2) when compared with the United States import statistics "the[] Indian values [were] too high to be considered a reliable indicator of the value of bearing quality steel used for the production of cups and cones." Def.'s Mem. Opp'n Luoyang, App. Ex. 4 at 4. Similarly, Commerce determined that: (1) export data from Japan to India was unreliable

because "the prices [were] too high, when compared to the U.S. benchmark," id.; and (2) "[a]lthough . . . Indonesian [import statistics] [were] closer to the U.S. benchmark in terms of price than the Indian values, like the Indian data, the Indonesian import statistics d[id] not provide a further breakdown of the aforementioned Indonesian basket category." Id. at 4-5. Commerce, however, re-examined the matter after considering comments made by Timken, namely, that Commerce can use a "range of [United States import] prices contained in HTS category 7228.30.20 . . . to gauge the reliability of Indian import values." Final Results, 64 Fed. Reg. at 61,839.

Upon examining the United States import data from HTS category 7228.30.20, Commerce determined that during the POR, "the range of prices from the countries with the most significant volumes of sales [was] approximately $642 [per metric ton ("MT")] to $834 [per MT]." Id. In the Final Results, Commerce compared Indian import data to the range of United States prices and found that: (1) as "in the past, [Commerce] [was] unable to isolate bearing quality steel in Indian import category 7228.30 because none of the eight-digit sub-categories within 7228.30 specifically include bearing quality steel bar," id. at 61,839-40; and (2) although the "'Others' category, 7228.3019, could contain the type of steel [at issue,] . . . the Indian values continue to be unreliable because

the values for these imports remain significantly higher than any price in the U.S. import range." Id. at 61,840.

Since the Indian import data was unreliable, Commerce then proceeded to examine export data from Japan to India. Id. Commerce observed that the export data from Japan to India "f[e]ll within the range of the values in the U.S. [benchmark] category," 7228.30.20, that is, the value of steel imported into the United States during the POR which ranged from $642 per MT to $834 per MT. Id. Consequently, Commerce concluded that export data from Japan to India would constitute the best available information to value steel used to produce the merchandise at issue. See id. Commerce stated that

> [b]ecause this Japanese tariff category is the narrowest category which could contain bearing quality steel, and because it is consistent with values contained in . . . [the United States] benchmark category, [Commerce] believe[s] that these data are the best alternative for valuing steel used in the production of cups and cones. It is [Commerce's] stated preference to use information from its primary surrogate to the extent possible. . . . Because these data relate to [Commerce's] primary surrogate and are within the price range of the U.S. benchmark category, [Commerce] ha[s] not analyzed data from [Commerce's] secondary surrogate, Indonesia, to find a value for steel used to produce cups and cones.

Final Results, 64 Fed. Reg. at 61,840.

Commerce refused to use Luoyang's PRC trading company import prices to value the bearing quality steel bar used in the

production of the subject merchandise at issue. See id. at 61,845.

Commerce pointed out:

> [Commerce] recognize[s] that in [Olympia Indus., Inc. v. United States ("Olympia 1999"), 23 CIT 80, 36 F. Supp. 2d 414 (1999)], the Court, in dicta, stated that Commerce must test the reliability of the trading company value in order to determine whether it comprises the best available information for purposes of the FOP calculation. However, Commerce respectfully disagrees with the Court's interpretation of the statute. As [Commerce] stated in [Commerce's] . . . Final Results of Redetermination Pursuant to Court Remand of Olympia Indus., Inc. v. United States [("Olympia 1998"), 22 CIT 387, 7 F. Supp. 2d 997 (1998)] . . . , nothing in the Lasko, [43 F.3d 1442,] decision alters the statutory mechanism for selection of surrogate values. In Lasko, the Court [of Appeals for the Federal Circuit ("CAFC")] merely recognized that, where the actual cost to the producer was a market economy price (and paid in a market economy currency), the actual cost to the producer was better information than a surrogate value. See Lasko, 43 F.3d at 1446. The selection of surrogate values is governed by section [1677b(c)(4)] . . . , which, as discussed above, establishes a preference for values from a comparable market economy that is a significant producer of comparable merchandise. Had Congress intended a preference for using import prices into the NME as surrogate values, it could easily have stated this preference.

Id. (emphasis in original).

### B.    Contentions of the Parties

#### 1.    Luoyang's Contentions

Luoyang contends that Commerce's decision to value bearing quality steel bar by using export data from Japan to India was not supported by substantial evidence and was contrary to law. See Pl.'s Mem. P. & A. Supp. Rule 56.2 Mot. J. Agency R. ("Luoyang's

Mem.") at 10-15, 17-31; Luoyang's Reply Br. ("Luoyang's Reply") at 2-15. In particular, Luoyang argues that Commerce's refusal to review PRC trading company import prices "and to determine whether that data constituted the best available information for purposes of the FOP analysis," Luoyang's Mem. at 17, was (1) an "[un]reasonable interpretation of [19 U.S.C. § 1677b(c)(1)]," id. at 21 (citing Olympia 1998, 22 CIT at 392, 7 F. Supp. 2d at 1002); (2) an "utter disregard" of Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, Luoyang's Mem. at 17; and (3) inconsistent with Commerce's prior administrative determination in the 10th Annual Review, 63 Fed. Reg. at 63,853-54.[4] See Luoyang's Mem. at 24-27. Luoyang

---

[4] Luoyang points out that in past reviews, "Commerce has determined that [NV] can most accurately be calculated by first valuing the factors of production on the basis of prices paid by the nonmarket economy country to market-economy suppliers before resorting to surrogate values." Luoyang's Mem. at 24 (emphasis in original) (citing Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China, 56 Fed. Reg. 20,588, 20,590 (May 6, 1991); Final Determinations of Sales at Less Than Fair Value: Oscillating Fans and Ceiling Fans From the People's Republic of China ("Oscillating Fans"), 56 Fed. Reg. 55,271 (Oct. 25, 1991); and Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the Republic of Hungary, 55 Fed. Reg. 21,066, 21,067 (May 22, 1990)).

Moreover, Luoyang asserts that in the 10th Annual Review, 63 Fed. Reg. at 63,853-54, "Commerce addressed the question [of] whether trading company import prices, as alternate surrogate data, are preferable to surrogate data from a market-economy country that is a significant producer and at a level of comparable economic development." Luoyang's Mem. at 25. In that review, Commerce stated:

(continued...)

maintains that the PRC trading company import data constitutes the "best available information" because "'[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country,'" Luoyang's Mem.

---

[4](...continued)
"To assess the reliability of the Chinese trading company's steel prices, [Commerce] . . . examined the [following] factors outlined in . . . Olympia [1999, 23 CIT at 82, 36 F. Supp. 2d at 416] . . . : (1) the value and volume of steel imports, (2) the type and quality of the imported steel, and (3) consumption of imported steel by the NME producer.

. . . .

Regarding the value of the steel imported by the trading company, [Commerce] found that the price paid by the trading company is within the range of prices created by the actual steel prices paid by PRC producers and [Commerce's] surrogate value. Consequently, the price paid by the PRC trading company is not aberrational. With respect to volume and consumption of steel by the NME producer [Commerce] note[s] that the amount of steel imported by the trading company was significant and that the NME producer in question consumed a significant amount of imported steel to produce the subject merchandise.

Based on the above, [Commerce is] using the trading company import steel price as surrogate data for those companies that actually used the imported steel."

Id. at 25 (emphasis in original) (quoting 10th Annual Review, 63 Fed. Reg. at 63,854).


Applying Commerce's three-prong test, Luoyang maintains that "[t]he PRC trading company prices [in the case at bar] are not aberrational and satisfy each of the Olympia [1999, 23 CIT 80, 36 F. Supp. 2d 414] criteria." Luoyang's Mem. at 26.

at 23 (quoting <u>Lasko Metal Prods., Inc. v. United States</u> ("<u>Lasko Metal</u>"), 16 CIT 1079, 1081, 810 F. Supp. 314, 317 (1992), <u>aff'd</u>, <u>Lasko</u>, 43 F.3d 1442), and "'[t]he same holds true . . . with respect to the trading company data.'"[5]  Luoyang's Mem. at 23 (quoting <u>Olympia 1998</u>, 22 CIT at 392, 7 F. Supp. 2d at 1002).

Responding to Commerce's argument that Commerce's "policy [i]s to evaluate inputs sourced from market-economy suppliers only when those inputs are actually purchased by the NME [producer], and not when purchased by NME trading companies," Luoyang's Mem. at 19, Luoyang asserts that: (1) 19 C.F.R. § 351.408(c)(1) (1998) does not "limit the use of NME import prices from market economy countries to those paid by the producer," Luoyang's Reply at 4; (2) both <u>Olympia 1999</u>, 23 CIT at 83, 36 F. Supp. 2d at 417, and <u>Olympia 1998</u>, 22 CIT at 390, 7 F. Supp. 2d at 1001, require Commerce, pursuant to 19 U.S.C. § 1677b(c)(1), to review PRC trading company import prices and to determine whether that data constitutes the best available information for the FOP analysis, <u>see</u> Luoyang's Mem. at 20; (3) "Commerce used trading company prices to value factors of production" in the 10<u><sup>th</sup> Annual Review</u>, 63 Fed. Reg. at 63,854,

_____

[5]  Luoyang further maintains that "[u]se of the PRC trading company data would lead to the most accurate, fair and predictable dumping margin calculations because this data shows what Luoyang's costs or prices would be if determined by market forces."  Luoyang Mem. at 24 (citing <u>Olympia 1998</u>, 22 CIT at 392, 7 F. Supp. 2d at 1002).

Luoyang's Reply at 4; (4) although the language in "the commentary accompanying the promulgation of [19 C.F.R. § 351.408(c)(1)] noted that the NME buyer should be the 'producer,'" id., "Commerce's use of the phrase 'normally'" means that Commerce did not choose to limit its evaluation of inputs sourced from market-economy suppliers solely to those inputs actually purchased by an NME producer, id. at 5;[6] and (5) 19 U.S.C. §§ 1677b(c)(1) and (c)(4), the legislative history of these provisions and Lasko, 43 F.3d 1442, do not prohibit the use of trading company import prices to value steel bar used in the production of TRB cups and cones. See Luoyang's Reply at 5-7. Luoyang, therefore, argues that a remand is necessary so that Commerce, by applying the three-pronged test approved in Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, would review and assess the reliability of the PRC trading company import

---

[6]  In its reply brief, Luoyang cites to the commentary accompanying the promulgation of 19 C.F.R. § 351.408(c)(1). See Luoyang's Reply at 4 n.1 (citing Final Rule on Antidumping Duties; Countervailing Duties ("Final Rule"), 62 Fed. Reg. 27,296 (May 19, 1997). The Final Rule provides in pertinent part:

> [Commerce] normally will use publicly available information to value factors. However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, [Commerce] normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, [Commerce] normally will value the factor using the price paid to the market economy supplier.

62 Fed. Reg. at 27,413; 19 C.F.R. § 351.408(c)(1).

prices as a surrogate to value all the bearing quality steel bar used by Luoyang to manufacture TRB cups and cones and, if Commerce "finds that the data is not 'aberrational' and . . . me[ets] the requirements of the Olympia [1999] reliability test," to use the PRC trading company data to value all of the subject merchandise at issue. Luoyang's Mem. at 31. In the alternative, Luoyang asserts that the PRC trading company data should be used as a surrogate to value "the steel Luoyang purchased through the trading company and actually used in the manufacture of those subject cups and cones." Id.

Next, Luoyang argues that Commerce erred in selecting export data from Japan to India under HTS category 7228.30.900 to value the subject merchandise at issue because that data is not an appropriate surrogate. See id. at 27-29; accord Luoyang's Reply at 8-12. In particular, Luoyang maintains that: (1) "the surrogate values based on . . . [export data from Japan] to India represent values for steel in category 7228.30.900 which could include the type of steel used to produce the cups and cones, but which in fact also may not include the type of steel used," Luoyang's Mem. at 27 (emphasis in original) (citing Final Results, 64 Fed. Reg. at 61,840); and (2) the export data from Japan to India fell outside the United States benchmark range of $642 per MT to $834 per MT.

See Luoyang's Reply at 8-9.[7]  Responding to Commerce's statement

that "Commerce's regulations give preference to the use of one

surrogate country" to value all factors of production, Luoyang

argues that there is no such restriction.[8]  Id. at 9; see also

Luoyang's Reply at 10-11 (citing 10th Annual Review, 63 Fed. Reg.

at 63,846; Final Results of Antidumping Administrative Review of

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,

---

[7]  In its reply brief, Luoyang points out that "for only three months did the monthly Japanese export prices to India fall within the [United States benchmark] range."  Luoyang's Reply at 9 (citing id., Pub. Doc. 141 at Att. 1).  "For the other nine (9) months the prices were either below (Apr-98 at $561 [per MT]) or above (the other 8 months)."  Luoyang's Reply at 9.  Additionally, Luoyang asserts that

> [t]he range of values for [export data from Japan] to India in HTS category 7228.30.900 was $561 per metric ton to $1,414 per metric ton and the average value was $871 per metric ton.  .  .  .  The average value of $871 per metric ton is not between [the United States benchmark range of] $642 per metric ton and $834 per metric ton.

Id. at 8-9 (emphasis in original) (citing Def.'s Mem. Opp'n Luoyang at 9).

[8]  The Court shall not entertain Commerce's statement since the Court is not aware of any particular preference which trumps the general requirement for precision that underlines the antidumping law.  See Timken 2001, 25 CIT at __, 166 F. Supp. 2d at 621 (stating that "[t]he statute permits Commerce to draw surrogate value information from more than one market economy country," citing 19 U.S.C. § 1677b(c)(1); and quoting Chemical Prods. Corp. v. United States, 10 CIT 700, 706, 650 F. Supp. 178, 182 (1986)(which provides that "'[t]he regulation [relied upon by Commerce] is silent concerning whether Commerce may use data from a country other than its designated surrogate when Commerce finds that a comparison of one element of foreign market value in the surrogate would yield an unrealistic result.'")

From the People's Republic of China, 62 Fed. Reg. 61,276, 61,282
(Nov. 17, 1997); and Timken Co. v. United States, 82 F. Supp. 2d
1371 (CIT 1999) [sic].[9])  Luoyang, therefore, asserts that if PRC
trading company import prices are not used as a surrogate, Commerce
should use export data from Japan to Indonesia over export data
from Japan to India as a surrogate to value the subject merchandise
at issue.  See Luoyang's Mem. at 32.  Alternatively, Luoyang
contends that if the Court sustains Commerce's use of export data
from Japan to India as a surrogate to value the subject merchandise
at issue, the values for January 1998 and March 1998 should be
excluded because they are aberrational.  See id.


         **2.    Commerce's Contentions**

    Commerce responds that its decision to use export data from
Japan to India to value bearing quality steel bar used by Luoyang
to manufacture TRB cups and cones is supported by substantial
evidence and otherwise in accordance with law.  See Def.'s Mem.
Opp'n Luoyang at 15-28.  Specifically, Commerce maintains that its
selection of the export data from Japan to India as the "best
available" surrogate value should be sustained because that data
represents "'a category which would include the type of bearing

_____

    [9]  The Court assumes that the correct citation is Timken Co.
v. United States ("Timken 1999"), 23 CIT 509, 59 F. Supp. 2d 1371
(1999).

quality steel bar [used in the production of the subject
merchandise]'; and . . . 'these Japanese export prices to India
fall within the range of the values in the [United States
benchmark].'"  Def.'s Mem. Opp'n Luoyang at 18 (quoting Final
Results, 64 Fed. Reg. at 61,840).  Responding to Luoyang's argument
that "Commerce's selection of [export data from Japan to India] is
erroneous because it 'only theoretically includes bearing steel
prices,'" Commerce maintains that Luoyang's argument is merely a
crafty restatement of "Commerce's own statement" aiming to distort
the gist of Commerce's conclusion.[10]  Def.'s Mem. Opp'n Luoyang at
18.  With respect to Luoyang's argument that the export data from
Japan to India is not a reliable surrogate, Commerce points out
that "'[t]he court's role is not to determine whether the
information chosen by Commerce is the 'best' actually available,
but whether the choice is supported by substantial evidence and is
in accordance with law.'"  Id. at 19 (quoting Novachem, Inc. v.
United States, 16 CIT 782, 786, 797 F. Supp. 1033, 1037 (1992)).[11]

---

[10]   The Court agrees with Commerce and is not persuaded by
Luoyang's assertion since Luoyang fails to use evidence on the
record to illustrate that export data from Japan to India does not
include the type of steel used to produce the TRB cups and cones at
issue.

[11]   Commerce contends that Luoyang "does not challenge
Commerce's conclusion that the average [export data from Japan to
India] falls within the [United States] benchmark range."  Def.'s
Mem. Opp'n Luoyang at 19.  Moreover, Commerce asserts that "by
suggesting the adoption of its own benchmark methodology while
(continued...)

Additionally, Commerce argues that its decision to reject the PRC trading company data as an alternative for valuing the bearing quality steel bar used in the production of the subject merchandise at issue was in accordance with law. See Def.'s Mem. Opp'n Luoyang at 20-28. Relying on Lasko, 43 F.3d 1442, and 19 C.F.R. § 351.408(c)(1), Commerce asserts that the transaction involving the PRC trading company's purchase of the steel bar at issue from a market-economy country does not "qualif[y] as a market economy purchase." Id. at 22. In particular, Commerce maintains that: (1) "the commentary accompanying the promulgation of [19 C.F.R. § 351.408(c)(1)] makes clear that Commerce intended to use a market economy price to value a factor of production only when the PRC producer itself made the purchase," id. (citing Final Rule, 62 Fed.

---

[11](...continued)
failing to find error with the methodology actually used by Commerce, Luoyang is merely challenging the correctness of Commerce's result." Id. at 20.

The Court disagrees with Commerce. Although Luoyang initially stated in its brief that "the average figure [that is, the average value of export data from Japan to India] is within the range of the [United States] benchmark range," Luoyang's Mem. at 28, in its reply brief Luoyang argues that

> [t]he range of values for [export data from Japan] to India in HTS category 7228.30.900 was $561 per metric ton to $1,414 per metric ton and the average value was $871 per metric ton. . . . The average value of $871 per metric ton is not between [the United States benchmark range of] $642 per metric ton and $834 per metric ton.

Luoyang's Reply at 8-9 (emphasis in original) (citing Def.'s Mem. Opp'n Luoyang at 9).

Reg. at 27,366); and (2) "the use of the price paid by Luoyang to the trading company in question would be contrary to congressional intent because that [NME] transaction is not reliable." Def.'s Mem. Opp'n Luoyang at 24 (citing S. Rep. No. 93-1298 (1974), reprinted in 1974 U.S.C.C.A.N. 7186, 7311).

Contrary to Luoyang's argument that both Olympia 1999, 23 CIT at 83, 36 F. Supp. 2d at 417, and Olympia 1998, 22 CIT 387, 7 F. Supp. 2d 997, require Commerce to review PRC trading company import prices and to determine whether that data constitutes the best available information for the FOP analysis pursuant to 19 U.S.C. § 1677b(c)(1), Commerce maintains that it disagrees with those decisions and that Lasko, 43 F.3d at 1446, "'merely recognized that, where the actual cost to the producer was a market economy price (and paid in a market economy currency), the actual cost to the producer was better information than a surrogate value.'" Def.'s Mem. Opp'n Luoyang at 25 (quoting Final Results, 64 Fed. Reg. at 61,845, emphasis in original). Commerce further maintains that it properly rejected PRC trading company import prices from its FOP analysis because "[t]his 'actual cost' does not exist in the trading company situation because the price paid by the trading company to the market economy supplier does not reflect the price paid by the PRC producer to the trading company." Def.'s Mem. Opp'n Luoyang at 25.

Commerce concedes that during its prior determination (that is, 10th Annual Review, 63 Fed. Reg. at 63,854), it adhered to Olympia 1999, 23 CIT at 83, 36 F. Supp. 2d at 417, and Olympia 1998, 22 CIT 387, 7 F. Supp. 2d 997, by reviewing PRC trading company import prices and determining whether that data constituted the best available information for purposes of the FOP analysis, see id. at 27. However, Commerce maintains that

> [h]aving reconsidered the meaning of Lasko, [43 F.3d 1442,] and the statute's NME provisions, Commerce now views Lasko, [43 F.3d 1442] as limited to the situation involving the actual cost to the producer (not the price paid by the trading company). Commerce further views the statute itself as expressing a preference for the use of values from a comparable market economy that is a significant producer of comparable merchandise. Moreover, in [10th Annual Review, 63 Fed. Reg. 63,842], Commerce conducted its review applying its prior regulations. . . . The current regulations do not permit the result advocated by Luoyang.

Id. at 27-28.


### 3.    Timken's Contentions

Timken generally agrees with Commerce and maintains that Commerce's decision to use export data from Japan to India to value the bearing quality steel bar used by Luoyang in the production of TRB cups and cones over PRC trading company import prices was supported by substantial evidence and was in accordance with law. See Timken's Resp. Opp'n Pl.'s Mot. J. Agency R. ("Timken's Resp.") at 8-33. In particular, Timken argues that by selecting export

data from Japan to India to value the subject merchandise at issue,

Commerce "followed the statutory scheme [under 19 U.S.C. §

1677b(c)(4) and 19 C.F.R. § 351.408(c)(1)], since [Commerce]

clearly used, 'to the extent possible,' the 'best available

information' as judged by the surrogate selection."[12]  Timken's

Resp. at 9.  Moreover, Timken asserts that the Court should sustain

Commerce's selection of export data from Japan to India as the

"best available information" to value the subject merchandise at

issue because: (1) unlike export data from Japan to India which

meets the statutory preference of 19 U.S.C. § 1677b(c)(4) since it

constitutes a "surrogate value[] from a comparable market economy

that is a significant producer of comparable merchandise[,] . . .

there is no statutory preference, mandatory or otherwise, for the

use of PRC trading company import prices," id. at 10; (2) export

---

[12]  In its response brief Timken points out that

> [a]pplying . . . § 1677b(c)(4)['s preference] in this
> case, [Commerce] found that the use of values from its
> primary-surrogate-country India was possible. [Commerce]
> was, therefore, not required to assess the pros and cons
> of using PRC trading company import prices.

Timken's Resp. at 21; see also id. at 28-29.

Moreover, contrary to Luoyang's argument that Commerce should have used export data from Japan to Indonesia over export data from Japan to India, Timken contends that export data from Japan to India is the "best available information" to value the subject merchandise at issue  because: (1) "Indonesia has only two bearings producers and neither produces [TRBs]" whereas "India's bearing industry has at least 17 producers and 7 producers of [TRBs]." Id. at 30.

data from Japan to India is "consistent with the objectives of §
1677b(c)(4) which favor the use of publicly available sources of
information to value factors of production," id. at 11, whereas
"Luoyang's PRC trading company import prices are not broad,
publicly-available information from a comparably reliable,
verifiable, and reusable source," id. at 12; (3) Luoyang has failed
to assert that it purchased the subject merchandise at issue from
the PRC trading company in a convertible currency, see id.; and (4)
Commerce's selection of export data from Japan to India to value
the bearing quality steel bar used by Luoyang to manufacture TRB
cups and cones was consistent with "[t]he purpose of the
antidumping statute[s] [that is, 19 U.S.C. §§ 1677b(c)(1) and (4)]
. . . to calculate dumping margins as accurately as possible." Id.
(citing Lasko, 43 F.3d at 1446).

Additionally, Timken maintains that Luoyang's reliance on
Lasko, 43 F.3d 1442, Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414,
Olympia 1998, 22 CIT 387, 7 F. Supp. 2d 997, and Olympia Indus.,
Inc. v. United States ("Olympia 1997"), 21 CIT 364 (1997), is
misplaced. See Timken's Resp. at 14-26. First, referring to
Lasko, 43 F.3d at 1446, and Olympia 1998, 22 CIT at 390-91, 7 F.
Supp. 2d at 1001, Timken asserts that the PRC trading company
import prices are not actual prices but are merely surrogate
values. See Timken's Resp. at 14 n.5. Second, Timken argues that

the CAFC in Lasko, 43 F.3d at 1446, addressed "'whether or not . . . [Commerce was] permit[ted] to determine the factors of production using both surrogate country values and actual cost values,'" id. at 14-15 (quoting Lasko, 43 F.3d at 1445), and did not address the issue of the proper interpretation of 19 U.S.C. § 1677b(c)(4) or the use of Chinese trading company purchases as surrogates. See id. at 15. Third, Timken contends that the Olympia cases (that is, Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, Olympia 1998, 22 CIT 387, 7 F. Supp. 2d 997, and Olympia 1997, 21 CIT 364) were "decided on [the] facts [of those cases] and did not address the proper interpretation of 19 U.S.C. § 1677b(c)(4)." Id. at 15-20. Fourth, Timken maintains that since the Court in Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, took an "additional step of disapproving [Commerce's] interpretation of 19 U.S.C. § 1677b(c)(4)" by stating that Commerce must test the reliability of the trading company value in order to determine whether it comprises the best available information for purposes of the FOP calculation, this additional step was merely dicta and "this Court remains free to sustain" Commerce. Id. at 19-20. Finally, Timken asserts that Commerce is not required to apply the three-pronged test approved in Olympia 1999, 23 CIT 80, 36 F. Supp. 2d 414, to review and assess the reliability of the PRC trading company import prices because: (1) "[t]here is no three-part . . . test in the statute or regulations compelling a specific methodology to be used in selecting surrogate values," id. at 23 (citing Lasko, 43 F.3d at 1446); and (2)

Commerce, despite Commerce's application of the three-pronged test in the 10th Annual Review, 63 Fed. Reg. 63,842, "provided a reasonable explanation . . . for rejecting PRC trading company import prices."  Timken's Resp. at 24.

In the alternative, Timken argues that, if the Court remands to Commerce to review and assess the reliability of the PRC trading company import prices, Commerce should consider whether there was: (1) "a significant difference between the resale price and the PRC trading company import prices and whether that difference was sufficient to cover the trading company's costs"; (2) "any countertrade or other arrangements between the trading company and its market-economy supplier"; (3) "any commissions or other consideration paid by the purchaser or supplier to the trading company, or lack thereof"; and (4) "any affiliation between the trading company, the market-economy supplier and/or the Chinese manufacturer."  Id. at 25.  Moreover, Timken maintains that "[i]f the Court requires use of Luoyang's PRC trading company import prices, those prices should not be extended to value other purchases of steel."  Id. at 26.

Next, contrary to Luoyang's argument that certain values of export data from Japan to India should be excluded because they are aberrational (that is, values for January 1998 and March 1998), Timken asserts that: (1) "the mere fact that some months were high

is not a basis for exclusion," id. at 31; (2) "in any average, some values exceed the norm, while other values are below, id. at 32; and (3) "Luoyang cannot 'pick and choose' and conveniently eliminate only high values." Id.


C. **Analysis**

1. **Commerce's Changes of Policy or Methodology**

Agency statements provide guidance to regulated industries. While "'an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future,'" Transcom, Inc. v. United States, 24 CIT ___, ___, 123 F. Supp. 2d 1372, 1381 (2000) (quoting ITT World Communications, Inc. v. FCC, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." Southern Cal. Edison Co. v. United States, 226 F.3d 1349, 1357 (Fed. Cir. 2000). "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy . . . .'" Chevron, 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not disturb [the agency decision] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" Chevron, 467 U.S. at 845 (quoting United States v. Shimer, 367 U.S. 374, 382-83 (1961)). Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis. Under the Chevron regime, agency discretion to reconsider policies is inalienable. See Chevron, 467 U.S. at 843. Any assumption that Congress intended to freeze an administrative interpretation of a statute would be entirely contrary to the concept of Chevron which assumes and approves the ability of administrative agencies to change their interpretations. See, e.g., Maier, P.E. v. United States EPA, 114 F.3d 1032, 1043 (10th Cir. 1997), J.L. v. Social Sec. Admin., 971 F.2d 260, 265 (9th Cir. 1992), Saco Defense Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450-51 (D. Me. 1985). In sum, underlying agency interpretative policies "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844.

Moreover, "'[a]n [agency] announcement stating a change in the method . . . is not a general statement of policy.'" American Trucking Ass'ns, Inc. v. ICC, 659 F.2d 452, 464 n.49 (5th Cir. 1981) (quoting Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979) (internal quotations omitted)). While a policy "denotes . . . [the] general purpose . . . [of the statute] considered as directed to the welfare or prosperity of the state," BLACK'S LAW DICTIONARY 1157 (6th ed. 1990), methodology refers only to the "performing [of] several operations[] in the most convenient order," id. at 991; accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620 (2d Cir. 1976). Consequently, the courts are even less in the position to question an agency action if the action at issue is a choice of methodology, rather than policy. See, e.g., Maier, P.E., 114 F.3d at 1043 (citing Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1221 (D.C. Cir. 1983)). Similarly, an agency decision to change its methodology, that is, to take an act of statutory implementation while pursuing the same policy, should be examined under the Chevron test and sustained if the new methodology is reasonable. See, e.g., Koyo Seiko Co., v. United States, 24 CIT ___, ___, 110 F. Supp. 2d 934, 942 (2000) (stating that "'the use of different methods [of] calculati[on] . . . does

not [mean there is a] conflict with the statute,'") (quoting Torrington Co. v. United States, 44 F.3d 1572, 1578 (Fed. Cir. 1995)).

Therefore, Commerce's refusal to review and use PRC trading company import data and Commerce's consequential use of export data from Japan to India as a surrogate value for bearing quality steel bar used by Luoyang to manufacture TRB cups and cones was a justifiable change of methodology as long as such change in position was reasonably supported by the record.

### 2. Commerce's Determination at Bar

The CAFC has reasoned that "the purpose of the statutory provisions [that is, 19 U.S.C. §§ 1677b(c)(1) and (4)] is to determine antidumping margins 'as accurately as possible.'" Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (quoting Lasko, 43 F.3d at 1446); see also Olympia 1998, 22 CIT at 390, 7 F. Supp. 2d at 1000-01 (noting that "accuracy is the touchstone of the antidumping statute" and citing Rhone Poulenc, Inc. v United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Additionally, Commerce's "task in [an NME] investigation is to calculate what . . . [the] costs or prices would be [in the NME] if such prices or costs were determined by market forces." Tianjin, 16 CIT at 940,

806 F. Supp. at 1018.

### a.   Commerce's Refusal to Review and Use PRC Trading Company Import Prices

The Court finds that Commerce's refusal to review PRC trading company import prices and to determine whether that data constituted the best available information for purposes of the FOP analysis was unreasonable.  Specifically, the Court disagrees with Commerce's and Timken's narrow reading of Lasko, 43 F.3d 1442, and 19 C.F.R. § 351.408(c)(1).[13]  The Court in Lasko Metal, 16 CIT at 1081, 810 F. Supp. at 317, reasoned that "[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country." Additionally, the CAFC observed:

> "[w]here [it] can [be] determine[d] that a [non-market economy] producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices.  Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law."

Shakeproof, 268 F.3d at 1382 (emphasis in original) (quoting Lasko,

---

[13]   The Court also disagrees with Timken that Commerce was not required to assess the PRC trading company data since Commerce, applied 19 U.S.C. § 1677b(c)(4)'s preference by valuing the subject merchandise using values from its primary surrogate (that is, India).  The Court finds that there is no requirement that Commerce value FOPs pursuant to 19 U.S.C. § 1677b(c)(4) prior to resorting to a PRC trading company's import prices paid to a market-economy supplier to value material costs for certain steel inputs.

43 F.3d at 1446); accord Oscillating Fans, 56 Fed. Reg. at 55,275; see also Olympia 1998, 22 CIT at 392, 7 F. Supp. 2d at 1002 (stating that the "same holds true here with respect to the trading company data"); Timken Co. v. United States, 26 CIT __, __, 201 F. Supp. 2d 1316, 1335 (2002)(finding that "Commerce's decision to use [a] PRC trading company's import steel price as surrogate data for [certain PRC producers] is reasonable, is in accordance with law and is in accord with the purpose of the statutory provisions [that is, §§ 1677b(c)(1) and (c)(4)] to determine antidumping margins as accurately as possible").

Next, observing that 19 U.S.C. § 1677b(c)(1) does not specify what constitutes "best available information," the Court concludes that "'[t]he statute[,] [therefore,] does not require Commerce to follow any single approach in evaluating data.'" Timken 1999, 23 CIT at 515, 59 F. Supp. 2d at 1376 (quoting Olympia 1997, 21 CIT at 368, and citing Lasko, 43 F.3d at 1446); see also Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999), aff'd, Shakeproof, 268 F.3d 1376 (stating that the "statute requires Commerce to use the best available information, but does not define that term" and quoting Olympia 1998, 22 CIT at 389, 7 F. Supp. 2d at 1000, that "'[t]he relevant statute does not clearly delineate how Commerce should determine what constitutes'" the best available

information).  While the Court finds that Commerce is not required
to apply the three-pronged test approved in Olympia 1999, 23 CIT
80, 36 F. Supp. 2d 414, to review and assess the reliability of the
PRC trading company import prices, the Court remands this issue to
Commerce with instructions to examine whether or not the PRC
trading company import prices constitute the "best available
information" to value either all of the subject merchandise at
issue or a portion of the subject merchandise purchased by Luoyang
through the trading company and used by Luoyang in the manufacture
of TRB cups and cones and, if Commerce concludes that the PRC
trading company import prices present the "best available
information" for the purpose of such surrogate evaluation, to
recalculate Commerce's determination not inconsistent with this
opinion.

> **b.    Commerce's Decision to Value Bearing
>         Quality Steel Bar by Using Export Data
>         from Japan to India**

     The Court disagrees with Commerce and Timken that Luoyang is
assailing not the reasoning but rather the correctness of
Commerce's result, which is outside the Court's standard of review.
See Writing Instrument Mfrs. Ass'n, Pencil Section v. United
States, 21 CIT 1185, 1195, 984 F. Supp. 629, 639 (1997).  During
the review at issue, Commerce observed:

     In comparing [export data from Japan to India] to the

range of values contained in the [United States] benchmark [that is, the value of steel imported into the United States during the POR under HTS category 7228.30.20 which ranged from $642 per MT to $834 per MT], [Commerce] found that these Japanese export prices to India fall within the range of the values in the [United States] category.

Final Results, 64 Fed. Reg. at 61,840.

Nevertheless, as Luoyang points out:

The range of values for [export data from Japan] to India in HTS category 7228.30.900 was $561 per metric ton to $1,414 per metric ton and the average value was $871 per metric ton. . . . The average value of $871 per metric ton is not between [the United States benchmark range of] $642 per metric ton and $834 per metric ton.

Luoyang's Reply at 8-9 (emphasis in original) (citing Def.'s Mem. Opp'n Luoyang at 9).

However, the Court disagrees with Luoyang that the Court should order that Commerce exclude the values for January 1998 and March 1998 from the export data from Japan to India. Luoyang may not usurp Commerce's role as fact-finder and substitute Luoyang's analysis for the result reached by Commerce.

Next, with respect to Luoyang's argument that Commerce should have used export data from Japan to Indonesia over export data from Japan to India as a surrogate to value the subject merchandise at issue, the Court notes that Commerce admittedly failed to review export data from Japan to Indonesia as a surrogate value. See Final Results, 64 Fed. Reg. at 61,840 (Commerce "ha[s] not analyzed

data from [Commerce's] secondary surrogate, Indonesia, to find a value for steel used to produce cups and cones"). The Court finds that Commerce's reasoning for refusing to review the export data from Japan to Indonesia as a surrogate value was not sufficiently explained. To the contrary, it was illogical for Commerce to utilize export data from Japan to India and then to subsequently fail to review analogously structured export data from Japan to Indonesia.

Based on the foregoing, the Court remands this issue to Commerce to examine if, and only if, Commerce finds that the PRC trading company import prices do not constitute the "best available information," whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones, and to explain, (if Commerce finds that export data from Japan to India is the "best available information,") how the entire export data from Japan to India falls within the range of values in the United States category benchmark range.

**II.  Commerce's Inclusion of "Consumption of Traded Goods"
     in Indian Bearings Producers' Direct Input Costs**

   **A.   Background**

     In the Final Results, Commerce designated the line item

"consumption of traded goods" in certain Indian bearings producers'

1997-98 annual reports as material costs to be included in direct

input costs that were used as the denominator of the overhead,

SG&A, and profit rate calculations.  See 64 Fed. Reg. at 61,844;

see also  Def.'s Mem. Partial Opp'n Timken's Mot. J. Agency R.

("Def.'s Mem. Partial Opp'n Timken), App. Ex. 5 at 3-4.

Specifically, Commerce explained that

> [Commerce] disagree[s] that [Commerce] should exclude
> "Consumption of Traded Goods" from the direct input costs
> calculated for the Indian bearings producers.  Although
> the CIT did instruct [Commerce] to exclude the purchases
> of traded goods from the cost of manufacture with respect
> to the 1994-95 administrative review of TRBs in Timken v.
> U.S., [23 CIT 509, 59 F. Supp. 2d 1371], that ruling is
> not yet final.  Thus, [Commerce is] not compelled to
> apply the court-directed methodology in these reviews.
>
> [Commerce] further note[s] that [Commerce] excluded
> "Consumption of Traded Goods" from [Commerce's] direct
> input costs calculation in the preliminary results of the
> new shipper review.  Again, because Timken v. U.S., [23
> CIT 509, 59 F. Supp. 2d 1371] is not yet final,
> [Commerce] ha[s] revised [Commerce's] preliminary
> calculations to include the traded goods amount in direct
> input costs.

Final Results, 64 Fed. Reg. at 61,844.

**B. Contentions of the Parties**

Timken asserts that the "consumption of traded goods" should be excluded from the direct input costs denominator used in the overhead, SG&A and profit rate calculations. See Mem. P&A Supp. Timken's Mot. J. Agency R. ("Timken's Mem.") at 2, 22-23. Relying on Timken 1999, 23 CIT at 518-19, 59 F. Supp. 2d at 1378-79, Timken maintains that this Court: (1) "rejected [Commerce's] inclusion of the line item for 'traded goods' in material costs used to calculate overhead, SG&A and profit ratios in its review of the 1994-95 period," id. at 22; and (2) "agreed that [Commerce] had failed to demonstrate how these already manufactured goods constitute a material cost incurred in manufacturing the subject merchandise." Id. (internal quotations omitted). Moreover, contrary to Commerce's argument that this Court's decision in Timken 1999, 23 CIT 509, 59 F. Supp. 2d 1371, is not yet final, Timken points out that "this Court's decision in Timken [1999], did become final and was not appealed." Id. (citing Timken Co. v. United States, 2000 Ct. Intl. Trade LEXIS 12, *1, Slip. Op. 00-13 (Feb. 8, 2000)). Timken, therefore, argues that this case should be remanded to Commerce with instructions that Commerce exclude "consumption of traded goods from the cost of materials used in the denominator of the overhead, SG&A, and profit ratios" and recalculate the dumping margins accordingly. Timken's Mem. at 23.

Commerce agrees that a remand is necessary to exclude the "consumption of traded goods" from Commerce's overhead, SG&A and profit rate calculations since "consumption of traded goods utilized by Commerce in the Final Results, [64 Fed. Reg. at 61,844,] are similar in nature to the 'purchases of traded goods' reviewed by the Court in Timken [1999]." Def.'s Mem. Partial Opp'n Timken at 21.

### C.   Analysis

In Timken 1999, 23 CIT 509, 59 F. Supp. 2d 1371, this Court determined that "Commerce failed to demonstrate how these already manufactured goods [that is, purchases of traded goods] constitute a material cost incurred in manufacturing the subject merchandise." Id., 23 CIT at 519, 59 F. Supp. 2d at 1379.

Because Commerce's inclusion of the "consumption of traded goods" in Commerce's overhead, SG&A and profit rate calculations, and the parties' arguments are practically identical to those presented in Timken 1999, 23 CIT 509, 59 F. Supp. 2d 1371, the Court adheres to its reasoning in Timken 1999, and remands this issue with instructions that Commerce exclude "consumption of traded goods" from Commerce's overhead, SG&A and profit rate calculations and to recalculate the dumping margins accordingly.

### III. Commerce's Use of Wage Rates from Chapter 5 of the International Labor Office's 1998 Yearbook of Labor Statistics to Value Labor

#### A.    Background

During the POR, Commerce, pursuant to 19 C.F.R. § 351.408(c)(3) (1998), used a regression-based wage rate to value labor costs.  See Preliminary Results, 64 Fed. Reg. at 36,856. Commerce explained that

> [b]ecause of the variability of wage rates in countries with similar levels of per capita Gross Domestic Product (GDP), section 351.408(c)(3) of [Commerce's] regulations (19 CFR Part 351, April 1998) requires the use of a regression-based wage rate.  Therefore, to value the labor input, [Commerce] used the PRC regression-based wage rate published by Import Administration on its website, which was last revised on May 1999.  The source of the wage rate data on the Import Administration's website is the 1998 Yearbook of Labour Statistics, published by the International Labour Office (ILO) . . . Chapter 5: Wages in Manufacturing.

Def.'s Mem. Partial Opp'n Timken, App. Ex. 3 at 4.

In the Final Results, Commerce valued the PRC labor costs by utilizing the wage rates reported in Chapter 5 of the 1998 Yearbook instead of the labor costs reported in Chapter 6A of the 1998 Yearbook as proposed by Timken.[14]  Commerce determined that

---

[14]  Commerce and Timken point out that the differences between Chapter 5 and Chapter 6A of the 1998 Yearbook are:

> Chapter 6A of the 1998 Yearbook of Labour Statistics [is] a category of "labour costs" that includes the compensation of employees as well as additional costs borne by the employer such as vocational training,

(continued...)

[Commerce's] regulations at section 351.408(c)(3) state that "[Commerce] will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries." Therefore, to value the labor inputs[,] . . . [Commerce] applied the PRC regression-based wage rate published by the Import Administration on its website, which was last revised in May 1999.

With respect to [Timken's] argument, [Commerce] disagree[s]. The [1998 Yearbook] states that the wage rates, used to calculate the regression analysis are comprehensive wage rates which also includes overtime, bonuses, holiday pay, incentive pay, pay for piecework, and cost-of-living allowances. See Magnesium from the People's Republic of China, Final Results of Antidumping Duty New Shipper Administrative Review, 63 Fed. Reg. 3085, 3091 (Jan. 21, 1998). Thus, for purposes of these final results, [Commerce] ha[s] not adjusted the regression-based wage rate used in the preliminary results.

Final Results, 64 Fed. Reg. at 61,842.

### B.    Contentions of the Parties

Timken contends that Commerce's decision to value PRC labor costs by using the wage rates in Chapter 5 of the 1998 Yearbook rather than the labor costs in Chapter 6A of the 1998 Yearbook was

---

[14](...continued)
welfare services, the cost of workers' housing, the cost of educational facilities, grants to credit unions, the cost of recruitment, and taxes. . . . [Whereas,] Chapter 5 of the 1998 Yearbook of Labour Statistics [is] a category of "wage rates" that reflects cash payments received from employers, including overtime, bonuses, holiday pay, incentive pay, pay for piecework, and cost-of-living allowances.

Def.'s Mem. Partial Opp'n Timken at 26 (citing Timken's Mem. at 11).

not supported by substantial evidence and was contrary to law. See Timken's Mem. at 23-25.  In particular, Timken argues that: (1) Commerce's use of Chapter 5 wage rates was a departure from Commerce's consistent practice of "interpret[ing] [19 U.S.C. §§ 1677b(c)(1) and (3)] . . . as calling for the use of fully-loaded costs, including all the costs and benefits in addition to basic wage, of employing labor," Timken's Mem. at 23 (citing 10Th Annual Review, 63 Fed. Reg. at 63,848, and Final Results and Partial Recission of Antidumping Duty Administrative Review of Maganese Metal From the People's Republic of China, 63 Fed. Reg. 12,440, 12,446 (March 13, 1998)); see also, Reply Br. Timken Co. ("Timken Reply") at 2-4; (2) "the record is devoid of evidence that Chapter 5 wage rates [of the 1998 Yearbook] are comprehensive," Timken's Mem. at 24, because "[f]or example, the wage rates in Chapter 5 did not include additional costs for employers' social security expenditures or welfare services . . . [and these] costs [are not] captured anywhere else in [Commerce's] calculation," Timken's Reply at 6-7; and (3) "[a] broad reading of 'wage rates' in § 351.408(c)(3), which calls for use of fully-loaded labor costs when available, would save the regulation from running afoul of the statutory scheme."  Timken's Reply at 9 (emphasis omitted). Timken, therefore, asserts that a remand is necessary so that Commerce can value PRC labor costs using Chapter 6A of the 1998 Yearbook or, in the alternative, "explain why [Commerce's]

departure from established practice was lawful in the face of the statute and statutory scheme." Timken's Reply at 8; see also Timken's Mem. at 25. In the alternative, Timken argues that, if the Court sustains Commerce's use of Chapter 5 wage rates, the Court should "require [Commerce] to account for all labor costs not included in Chapter 5 wage rates elsewhere in [Commerce's] calculation." Timken's Reply at 9.

Additionally, Timken maintains that Commerce's "labor cost methodology should be the same for calculating constructed value and factors of production." Id. at 5; see also id. at 9 (stating that "the statutory scheme calls for costs included in constructed value and factors of production to be the same").[15] Responding to Commerce's argument that 19 U.S.C. § 1677b(c)(1), 19 U.S.C. § 1677b(c)(3), and 19 C.F.R. § 351.408(c)(3) do not require Commerce to use comprehensive costs in valuing labor, Timken maintains that this argument "must be rejected as a post hoc rationalization

---

[15] The Court disagrees with Timken's argument that Commerce's labor cost methodology should be the same for calculating constructed value and factors of production. Unless Commerce interprets the very same terms differently for the purpose of interrelated statutes during the same review, Commerce could utilize the interpretations that Commerce could reasonably derive from the gists of the respective statutes. The Court can envision a distinction between 19 U.S.C. § 1677b(a) and 19 U.S.C. § 1677b(c)(1). Moreover, with respect to Timken's argument that "Generally Accepted Accounting Principles ["GAAP"]. . . call for the use of fully absorbed costs of producing the subject merchandise," Timken's Reply at 4, the Court observes that GAAP serves as a guide and Commerce is not statutorily bound by GAAP when valuing PRC labor costs.

because [Commerce] did not take this position" in Final Results, 64 Fed. Reg. at 61,842.[16]  Id. at 7.

In response, Commerce asserts that its decision to use Chapter 5 wage rates to value PRC labor costs is supported by substantial evidence and is in accordance with law.  See Def.'s Mem. Partial Opp'n Timken at 21-26.  Commerce argues that 19 U.S.C. § 1677b(c)(3) does not require Commerce "to utilize comprehensive costs for purposes of valuing labor [but] [r]ather, the statute merely directs [Commerce] to value the 'hours of labor required' as part of the [FOP] utilized in producing the merchandise."  Id. at 25.  Commerce further argues that Commerce complied with 19 C.F.R. § 351.408(c)(3) in using Chapter 5 wage rates rather than Chapter 6A labor costs to value PRC labor costs because: (1) 19 C.F.R. § 351.408(c)(3) "does not provide that Commerce must utilize comprehensive labor costs [but] [i]nstead, that . . . '[Commerce

_____

    [16]  The Court disagrees with Timken that Commerce's argument amounts to a post hoc rationalization.  Commerce's decision to employ an easier and, in Commerce's view, a more accurate methodology to value PRC labor costs, falls within Commerce's power and the Court will uphold such methodology as long as it is reasonable.  See Final Results, 64 Fed. Reg. at 61,842 (stating that the wage rates of Chapter 5 "are comprehensive wage rates").  Moreover, a legal argument entered by Commerce in its capacity as a defendant to a civil action with respect to the level of discretion offered by the relevant statute and regulation does not amount to a post hoc rationalization since Commerce argues its position within the parameters of common law litigation.  If Timken's argument is taken to its logical conclusion, every argument by every party with respect to the legal boundaries of any applicable provision should be deemed a form of post hoc rationalization.

shall] use regression-based wage rates,'" id. (quoting 19 C.F.R. §
351.408(c))(3)) (emphasis omitted); (2) 19 C.F.R. § 351.408(c)(3)
is silent as to the particular source Commerce is to use to value
wages, see Def.'s Mem. Partial Opp'n Timken at 26; and (3)
Commerce's preference to use Chapter 5 wage rates over Timken's
preference to use Chapter 6A labor costs to value PRC labor costs
should be sustained because "the Court should defer to Commerce's
interpretation of [the] regulation, not Timken's interpretation."
Id.


   **C.   Analysis**

   As a preliminary matter, the Court finds that Commerce's
decision to use the wage rates of Chapter 5 of the 1998 Yearbook
over the labor costs of Chapter 6A of the 1998 Yearbook to value
the PRC labor costs was a justifiable change of methodology as long
as such change in position was reasonably supported by the record.
See supra Discussion Part I, C1 (Analysis).

   The applicable statute provides that, when dealing with
imports from an NME country such as the PRC, Commerce shall
determine the NV of the subject merchandise based on FOPs utilized
in producing the merchandise and that Commerce shall value the
reported FOPs based on the best available information regarding the
values of FOPs in an appropriate market economy.  See 19 U.S.C. §

1677b(c)(1).  According to section 1677b(c)(3), the FOPs to be utilized in valuing merchandise from an NME include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  The statute further provides that while conducting NME investigations, Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  See 19 U.S.C. § 1677b(c)(4).

> Moreover, the relevant regulation provides:
>
> [f]or labor, [Commerce] will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries. [Commerce] will calculate the wage rate to be applied in nonmarket economy proceedings each year.  The calculation will be based on current data, and will be made available to the public.

19 C.F.R. § 351.408(c)(3).

In the case at bar, Commerce used the wage rates reported in Chapter 5 of the 1998 Yearbook, which were "made available to the public by means of Import Administration's website," to value the PRC labor costs.  Def.'s Mem. Partial Opp'n Timken at 24.  "The [1998 Yearbook] states that the wage rates [that is, the wage rates

of Chapter 5], used to calculate the regression analysis are comprehensive wage rates which also includes overtime, bonuses, holiday pay, incentive pay, pay for piecework, and cost-of-living allowances." Final Results, 64 Fed. Reg. at 61,842. Based on the foregoing, the Court finds that Commerce's decision to value PRC labor costs by using wage rates reported in Chapter 5 of the 1998 Yearbook over the labor costs reported in Chapter 6A of the 1998 Yearbook was reasonable, in accordance with law (that is, Sections 1677b(c)(1), (c)(3), (c)(4) and 19 C.F.R. § 351.408(c)(3)), supported by substantial evidence, and in accord with the purpose of the statutory scheme of determining antidumping margins as accurately as possible.[17] See Peer Bearing Co. v. United States, 25 CIT __, __, 182 F. Supp. 2d 1285, 1305 (2001) (pointing out that

---

[17] Timken, in support of its argument that the Court should "require [Commerce] to account for all labor costs not included in Chapter 5 wage rates elsewhere in [Commerce's] calculation [that is, for example in the SG&A expenses,]" Timken's Reply at 9, provided the Court with a letter dated January 8, 2001 indicating among other things that the 12th Administrative Review's Issues and Decision Memo for the 1998-99 Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results "is . . . relevant to Timken's position in the instant judicial review" with regard to labor costs. Timken's January 8, 2001, letter (citing Ex. 2 at 16-17). The Court is not persuaded by Timken's reference to the 12th Administrative Review and finds that while it is possible that the labor costs not included in Chapter 5 could have been included elsewhere in Commerce's calculation, the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

"'[i]n the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable'" (quoting <u>Timken 1999</u>, 23 CIT at 516, 59 F. Supp. 2d at 1377)); <u>see also</u> <u>Chevron</u>, 467 U.S. at 844-45, <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-40 (1944).

## IV. Commerce's Use of a PRC Producer's Market Economy Import Data

### A. Background

In the <u>Preliminary Results</u>, Commerce stated that a PRC producer purchased part of its steel sheet directly from a market-economy supplier and paid for such steel with market-economy currency. <u>See</u> 64 Fed. Reg. at 36,856. In the <u>Final Results</u>, Commerce used the PRC producer's import data, rather than surrogate data, to value the entire FOP (that is, both the directly imported FOP and the NME sourced FOP). <u>See</u> 64 Fed. Reg. at 61,844. Commerce reasoned that,

> [i]n accordance with [Commerce's] established practice and [Commerce's] regulations, [Commerce is] continuing to use the actual prices of directly imported steel to value steel inputs because these prices represent the actual market-based prices incurred in producing the subject merchandise and, as such, are the most accurate and appropriate values for this particular factor for the purpose of calculating NV. As noted by the respondents, this practice has been affirmed in court decisions, such as <u>Lasko</u>, [43 F.3d 1442] and is codified in [Commerce's] regulations at section 351.408(c)(1).
>
> As noted in [Commerce's] <u>Final Rule</u>, [62 Fed. Reg. at 27,366,] while [Commerce] do[es] not view the <u>Lasko</u> decision as permitting [Commerce] to use distorted

prices, [Commerce] believe[s] that the Court's emphasis on 'accuracy, fairness and predictability' provides [Commerce] with the ability to rely on prices paid by NME producers to market-economy suppliers in lieu of using surrogate values. . . . [Commerce] disagree[s] with [Timken] that imports into China are unreliable indicators of market values because China's domestic market is distorted by government intervention. While China's NME status indicates that domestic prices in China are unreliable, there is no evidence that domestic distortions impact the price at which market-economy suppliers would offer products for sale to Chinese producers. [Commerce] ha[s] no reason to assume that, when dealing with Chinese importers, market-economy suppliers ignore rules of supply, demand, and profit-seeking behavior within a competitive world market.

Id. at 61,844-45.


Moreover, Commerce observed:

Even if [Commerce] were to accept [Timken's] argument that excess steel supply in China leads foreign competitors to 'dump' steel on the Chinese market, [Timken] has not presented evidence that there is an excess supply of the particular type of steel used in the production of TRBs nor evidence that such excess supply somehow renders the steel prices being offered to certain Chinese TRB producers by market-economy suppliers unreliable. There are a variety of reasons for setting a particular price higher or lower than a world benchmark in an arm's length transaction. In examining actual sales between private parties, [Commerce] would have to be convinced by evidence on the record that the particular sale in question was in some way unrepresentative of market-economy forces. For example, [Commerce] would be willing to disregard a price paid by an NME producer to a market-economy supplier if the quantity of the input purchased in a given transaction is, for example, less than the volume that would normally be traded. Where the transaction is not in commercial quantities, the price may not be truly representative of a market price.

Id. at 61,845.

B.     **Contentions of the Parties**

1.     **Timken's Contentions**

Timken argues that Commerce's determination that a PRC bearing producer's import price[18] constituted the "best available information" under 19 U.S.C. § 1677b(c)(1) to value steel sheet was contrary to 19 U.S.C. § 1677b(c)(1) and unsupported by substantial evidence because Commerce failed to determine whether the price paid by the PRC bearing producer to the market-economy supplier was "market-driven" or representative of market prices. See Timken's Mem. at 25-34.  In particular, Timken maintains that Commerce "should not assume that Chinese bearing producers are paying world market prices for imported inputs," id. at 27 (emphasis omitted), because: (1) "[l]egislative history . . . warns that the 'best' information cannot be prices believed or suspected to be dumped or subsidized," Timken's Reply at 15; (2)  "NME markets are 'riddled with distortions' . . . [and] State-controlled economies control the entities that engage in foreign trade, as well as their sales prices," Timken's Mem. at 29 (quoting Georgetown Steel Corp. v. United States, 801 F.2d 1308, 1315 (Fed. Cir. 1986)); (3) "third countries do not necessarily trade with China on a market-economy basis," Timken's Mem. at 30; and (4) "China was the world's biggest

---

[18]   The Court notes that the PRC bearing producer's import price was the same for all of the imported steel sheet from the market-economy supplier.  See Def.'s Mem. Partial Opp'n Timken, Proprietary App. Ex. 1.

steel producer with excess capacity during the period of review .

. . [and, therefore,] Chinese bearing producers . . . could have

easily sourced their material inputs from domestic suppliers."

Id.; see also Timken's Reply at 21 n.11.

Timken further argues that Commerce's presumption that the PRC

bearing producer's import price constituted the "best available

information" to value the steel sheet used in the production of

cages "was tantamount to [a] conclusive presumption . . . and was

. . . inconsistent" with 19 U.S.C. § 1677b(c)(1) and 19 C.F.R. §

351.408(c)(1).[19] Timken's Reply at 17. Relying on the CAFC's

decision in Delverde, SRL v. United States, 202 F.3d 1360 (Fed.

Cir. 2000), Timken maintains that just as the CAFC "found that

[Commerce] erred when [Commerce] failed to consider the 'facts or

circumstances of the sale,' to produce evidence to show a subsidy,

or to make the specific findings required by [19 U.S.C. §

1677(5),]" id. at 14 (quoting Delverde, 202 F.3d at 1367), the

Court in this case should disapprove Commerce's determination that

the PRC bearing producer's import price constituted the "best

---

[19] In its reply brief, Timken asserts that Commerce's use of the word "normally" in 19 C.F.R. § 351.408(c)(1) "must be understood as contemplating additional circumstances," that is, circumstances in addition to those indicated by Commerce in Final Rule, 62 Fed. Reg. at 27,366, "wherein import prices would be rejected." Timken's Reply at 12 n.8. The Court does not agree with Timken's reading of 19 C.F.R. § 351.408(c)(1). Although the term "normally" refers to a predominate scenario, it does not preclude the same process of analysis in other situations.

available information" to value the steel sheet at issue because, "[a]nalogously to what [Commerce] did in <u>Delverde</u>, [Commerce in the case at bar] simply presumed that the import price[] w[as] the 'best' information without testing the facts in any way, much less producing evidence to support [Commerce's] finding of fact." Timken's Reply at 16.

Additionally, Timken contends that Commerce has the burden to establish the accuracy of the dumping margins and cannot assign the burden to prove the contrary to interested parties. <u>See id.</u> at 17-18. In particular, Timken maintains that Commerce's allocation of the burden of proof on Timken to show that the import price Commerce used was unrepresentative of market-economy forces was unreasonable because: (1) "[w]hile it may be reasonable for [Commerce] to allocate the burden of proof to the party with knowledge or having access to facts, it is unreasonable to allocate such burden to a party that has neither and can only raise questions," <u>id.</u> at 18; and (2) "Timken has repeatedly challenged the use of import prices in [various] reviews . . . [and Commerce] has rejected [Timken's] contentions without articulating what is required for Timken to show that such prices are unreliable."[20]

---

[20] Timken points out that Commerce, in rejecting Timken's challenges to the use of import prices in various reviews, "has merely suggested that it would reject prices that were not arm's length or for merchandise in quantities that were 'insignificant' or not 'meaningful.'" Timken's Reply at 20. Timken maintains that

(continued...)

Id. at 20.  Timken, therefore, argues that Commerce "must itself test the import prices to determine whether they are market driven."  Timken's Mem. at 32 (emphasis omitted).  Timken contends that, "as [Commerce] evaluates market-economy prices to determine whether they are reliable in a market-economy case, [Commerce] should evaluate those prices to determine whether they are reliable in an NME case."[21]  Timken's Mem. at 33-34.  Timken also contends that Commerce "did not compare the [import] price[] to other world market prices or consider the volume and frequency of imports from a market economy" and "did not consider whether the import price[] w[as] at arm's length, reflected commercial quantities, or reasonably reflected the actual cost of production in a comparable market economy."  Id. at 32.

Alternatively, Timken argues that "Timken amply rebutted [Commerce's] presumption" that the import data constituted the "best available information" to value the steel sheet at issue. Timken's Reply at 21 (emphasis omitted); see id. at 21-24.

_____

[20](...continued)
"this is insufficient to address the host of other potential situations wherein import prices would clearly not be the best available information on the facts."  Id.

[21]  Timken asserts that although Lasko, 43 F.3d at 1446, allows Commerce to use import prices from market-economy sources to value FOPs in appropriate situations, "the Court [in Lasko] did not address the issue [presented in this case] of whether [Commerce] had an obligation to determine whether the prices . . . were, in fact, market-driven or otherwise reliable."  Timken's Reply at 11 n.7.

Specifically, Timken points out that: (1) the import price used by Commerce to value the subject merchandise at issue was based on a sale that predated the POR by over a year "and more information was needed to determine whether that steel was actually used to manufacture the merchandise under review," id. at 21 n.12 (proprietary version); (2) a "single purchase was not sufficient to meet [the PRC producer's] steel requirements, and that further inquiry was necessary to determine whether non-price factors affected the sale," id.; (3) the import price used by Commerce to value the steel sheet at issue was lower than various benchmarks, see Timken's Mem. at 31-32 (proprietary version) (citing Timken's Mem. at 17, Table 3); (4) "[t]here was no evidence supporting [Commerce's] belief that the price the Chinese bearing producers would pay for imported steel would be unaffected by non-market considerations," Timken's Reply at 22; and (5) Commerce "had no information concerning how [the PRC producer] identified the source of its steel, traced the steel to production during the [POR], or produced from this steel [TRBs] exported to the United States. Nor did [Commerce] know whether the import price represented an ordinary transaction." Id. at 22-23 (proprietary version). Timken, therefore, requests that this Court remand the issue to Commerce with instructions "to determine whether or not the import price[] paid to [a] market-economy supplier[] to value steel sheet w[as] market driven . . . ." Timken's Reply at 23.

Next, relying on <u>Shakeproof Assembly</u>, 23 CIT 479, 59 F. Supp. 2d 1354, Timken contends that Commerce's decision to use a PRC producer's import data to value other purchases (that is, the NME sourced FOP) without "explain[ing] why [the] import [data was] more accurate (or 'meaningful') than surrogate-country values" was unsupported by substantial evidence and was contrary to law.[22] Timken's Reply at 28; <u>see also</u> <u>id.</u> at 24-28; Timken's Mem. at 34-37. Timken further contends that "[e]xtending the actual import [data] to the additional relevant steel served to magnify the original error." Timken's Reply at 26. Moreover, responding to Commerce's arguments that 19 C.F.R. § 351.408(c)(1) "(1) . . . permits [Commerce] to determine [NV] based on the company's own market-based experience; (2) . . . leads to more accurate dumping margins . . . ; and (3) . . . is consistent with the purpose of the statute [that is, 19 U.S.C. § 1677b(c)(1)] . . . ," Timken asserts

_____

[22] In its reply brief, Timken maintains that "Timken does not argue, as [Commerce] suggests, that [Commerce] incorrectly valued domestically-purchased steel using import prices from a market source, but instead that [Commerce] incorrectly valued the steel imported through a PRC trading company (to be distinguished from a market-[economy] country trading company)." Timken's Reply at 24 n.13 (proprietary version). The Court assumes that Timken's aforementioned statement means that Timken is contesting Commerce's decision to use a PRC producer's import data to value the FOP purchased from a PRC trading company. The record indicates that a PRC producer purchased various portions of the steel sheet at issue (1) directly from a market-economy supplier and paid for such steel with market-economy currency; and (2) from a certain PRC company that imported steel sheet from a certain country to China. <u>See</u> <u>Preliminary Results</u>, 64 Fed. Reg. at 36,856; <u>Final Results</u>, 64 Fed. Reg. at 61,844; Def.'s Mem. Partial Opp'n Timken, Proprietary App. Exs. 1, 2, 4, 6; Timken's Mem. Prop. Docs. 7, 15, 31, 34.

that these arguments must be rejected as post hoc rationalizations because Commerce did not articulate them in Final Results, 64 Fed. Reg. 61,844-45.[23]  Timken's Reply at 25.

### 2. Commerce's Contentions

Commerce responds that its determination to value certain steel inputs by using the price paid by a PRC bearing producer to a market-economy supplier was supported by substantial evidence, was in accordance with law and sustained by the CAFC in Lasko, 43 F.3d 1442.  See Def.'s Mem. Partial Opp'n Timken at 26-40.  In particular, Commerce points out that the CAFC in Lasko, 43 F.3d 1442, recognized that 19 U.S.C. § 1677b(c)(1) "requires Commerce to value factors of production using the 'best available information' and that," the CAFC found that "'the best available information on what the supplies used by the Chinese manufacturers would cost in a market economy country was the price charged by those supplies on the international market.'"  Id. (quoting Lasko, 43 F.3d at 1446).

Additionally, with respect to Timken's argument that Commerce erred in its decision to use a PRC bearing producer's import data to value the steel sheet at issue by failing to determine whether the prices paid by the PRC bearing producer to the market-economy

---

[23]  The Court disagrees with Timken that Commerce's arguments amount to a post hoc rationalization.  See supra Discussion Part III, B (Contentions of the Parties) n.16.

supplier were "market-driven" or representative of market prices, Commerce argues that Timken's argument should be rejected because Timken never presented this argument to Commerce in its case brief. See Def.'s Mem. Partial Opp'n Timken at 28-31. Commerce alleges that Timken, therefore, "failed to exhaust its administrative remedies with respect to this issue."[24] Id. at 28 (emphasis

_____

[24] In its reply brief, Timken first points out that "in its case brief, Timken argued":

> [C]oncerning the price of imported steel used for one Chinese producer's cages in the 97-98 review . . . , the unusual circumstances attending the importation indicate that the price was not representative and was indeed "aberrational" and unreliable. All surrogate values, including those based on market economy imports into China, must be reliable and reasonable values to be used for purposes of calculating normal value. . . .
>
> . . . .
>
> . . . Commerce does not have any reason to relax the require[ment]s of the statute and practice.
>
> To the contrary, Commerce should assume that any imports from market-economy countries are not valued at "reliable" market values, absent evidence that such values are otherwise consistent with world-market prices. The current approach turns this policy on its head – in effect ignoring the market distortions that NME methodology is designed to address.
>
> . . . The statute does not compel Commerce to use factor values that are unreliable or unrepresentative of market economy prices.

Timken's Reply at 29-30 (quoting Timken's Reply Pub. Doc. 132, emphasis omitted).

Second, Timken argues that "[d]uring the hearing, counsel for Timken again explained that [Commerce] was required to test every

(continued...)

omitted).

In the alternative, Commerce argues that, "[e]ven if Timken has exhausted its administrative remedies, Commerce acted within its discretion by not testing the prices in question to determine whether they were market-driven."  Id. at 31.  In particular, Commerce maintains that: (1) "Commerce properly assumes that, where a factor is purchased from a market economy supplier and purchased with a market economy currency, the price paid for that imported merchandise is not distorted [and could be] appropriately used for purposes of valuing the factor in question [in a manner] . . . consistent with the purpose of the antidumping law," id. at 31-32 (citing Lasko, 43 F.3d at 1446); (2) "Commerce['s] require[ment that] the party challenging the use of the market economy price [should] present evidence that the price is somehow inappropriate for determining NV" is consistent with Commerce's "'broad discretion in allocating investigative and enforcement resources,'" Def.'s Mem. Partial Opp'n Timken at 32 (quoting Torrington Co., 68 F.3d at 1350); and (3) since Timken fails to present "specific evidence of distortion" with regards to Commerce's use of the PRC producer's import data at issue, "Commerce does not err when it requires [Timken] to substantiate [its] views with record evidence

---

[24](...continued)
factor value and repeatedly requested that [Commerce] rethink its regulation."  Timken's Reply at 30 (emphasis omitted).

as opposed to mere speculation." Def.'s Mem. Partial Opp'n Timken

at 33 (citing LMI La-Metalli Industriale, S.p.A. v. United States,

912 F.2d 455, 460 (Fed. Cir. 1990)).

Finally, with respect to Commerce's determination to value the

entire FOP (that is, both the imported FOP and the NME sourced FOP)

by using a PRC producer's import data, Commerce asserts that

Commerce acted within the plain meaning of 19 C.F.R. §

351.408(c)(1). See Def.'s Mem. Partial Opp'n Timken at 34-35.

Commerce further asserts that 19 C.F.R. § 351.408(c)(1) is a

reasonable interpretation of 19 U.S.C. § 1677b(c)(1) because: (1)

"Commerce's interpretation is consistent with the fact that dumping

is an activity that is 'defined in terms of the marketplace,'"

id. at 36 (quoting Lasko, 43 F.3d at 1446); (2) "Commerce's use of

imported prices to value all purchases of the same factor of

production results in a more accurate dumping margin because these

imported prices reflect[] a market-driven decision by the company

in question," Def.'s Mem. Partial Opp'n Timken at 37; and (3)

"Commerce's interpretation is consistent with the underlying

purposes governing the non-market economy provisions of the

statute." Id.

Moreover, Commerce argues that Timken's contention regarding

Commerce's use of a PRC bearing producer's import data to value the

entire FOP at issue "do not demonstrate error in Commerce's

determination." Id. at 38 (emphasis omitted). Commerce points out that Timken's reliance on Shakeproof Assembly, 23 CIT 479, 59 F. Supp. 2d 1354, is mistaken because that "decision[] reviewed a Commerce determination that pre-dated the effective date of 19 C.F.R. § 351.408(c)(1)." Id. at 39. Commerce also points out that although "Commerce did not explain [in the Final Results, 64 Fed. Reg. at 61,844-45,] why the imports in question were meaningful[,] . . . Timken itself must accept responsibility for the absence of such an explanation because Timken never raised that issue with Commerce." Id. Commerce, therefore, contends that Timken failed to exhaust its administrative remedies with respect to this issue.[25] See id. at 39-40.


### C.  Analysis

The applicable statute provides that, when dealing with imports from an NME country such as the PRC, Commerce shall determine the NV of the subject merchandise based on FOPs utilized in producing the merchandise. See 19 U.S.C. § 1677b(c)(1). The statute further provides that Commerce shall value the reported FOPs based on the best available information regarding the values of FOPs in an appropriate market economy. See id. While

---

[25]  Commerce asserts that "[i]ndeed, the proprietary figures referenced by Timken appear to indicate that the amount of imported steel was, in fact, meaningful." Def.'s Mem. Partial Opp'n Timken at 40 n.30 (citing Timken's Reply Prop. Doc. 35).

conducting NME investigations, Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  See 19 U.S.C. § 1677b(c)(4).

The CAFC, however, reasoned that "the purpose of the statutory provisions [that is, §§ 1677b(c)(1) and (4)] is to determine antidumping margins 'as accurately as possible.'"  Shakeproof, 268 F.3d at 1382 (quoting Lasko, 43 F.3d at 1446); see also Olympia 1998, 22 CIT at 390, 7 F. Supp. 2d at 1000-01 (noting that "accuracy is the touchstone of the antidumping statute" and citing Rhone Poulenc, 899 F.2d at 1191.  Additionally, Commerce's "task in [an NME] investigation is to calculate what [the] . . . costs or prices would be [in the NME] if such prices or costs were determined by market forces."  Tianjin, 16 CIT at 940, 806 F. Supp. at 1018.

### 1.   Commerce's Decision to Value Certain Steel Inputs by Using the Price Paid by a PRC Bearing Producer

As a preliminary matter, the Court addresses Commerce's argument that Timken failed to exhaust its administrative remedies. The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration

before raising these claims to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155, (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action").[26]

---

[26] There is however, no absolute requirement of exhaustion in the Court of International Trade in non-classification cases. See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998). Therefore, because "each exercise of judicial discretion [does] not requir[e] litigants to exhaust administrative remedies," the court is authorized to determine proper exceptions to the doctrine of exhaustion. Alhambra, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), rev'd in part on other grounds, Koyo Seiko Co. v. United States, 20 F.3d 1156 (Fed. Cir. 1994)).

In the past, the court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F.

(continued...)

The purpose behind the doctrine of exhaustion is to prevent courts from premature involvement in administrative proceedings, and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967); see also Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (pointing out that the "exhaustion doctrine . . . serv[es] four primary purposes: [(1)] it ensures that persons do not flout [legally] established administrative processes . . .; [(2)] it protects the autonomy of agency decisionmaking; [(3)] it aids judicial review by permitting factual development [of issues relevant to the dispute]; and [(4)] it serves judicial economy by avoiding [repetitious] administrative and judicial factfinding and by" resolving sole claims without judicial intervention).

While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument, plaintiff's brief statement of the

---

[26](...continued)
Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) plaintiffs had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F. Supp. 1317, 1321 (1986).

argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.  See generally, Hormel v. Helvering, 312 U.S. 552 (1941); see also Rhone Poulenc, 899 F.2d at 1191.  The sole fact of an agency's failure to address plaintiff's challenge does not invoke the exhaustion doctrine and shall not result in forfeiture of plaintiff's judicial remedies.  See generally, B-West Imports, Inc. v. United States, 19 CIT 303, 880 F. Supp. 853 (1995).  An administrative decision not to address the issue cannot be dispositive of the question whether or not the issue was properly brought to the agency's attention.  See, e.g., Allnutt v. United States DOJ, 2000 U.S. Dist. LEXIS 4060 (D. Md. 2000).

In the case at bar, Timken sufficiently provided Commerce with an opportunity to address the issue of Commerce's failure to determine whether the price paid by the PRC bearing producer to the market-economy supplier was "market-driven" or representative of market prices when Timken in its case brief argued inter alia that: (1) "'the unusual circumstances attending the importation indicate that the price was not representative and was indeed 'abberrational' and unreliable,'" Timken's Reply at 29 (quoting Timken's Reply Pub. Doc. 132, emphasis omitted); (2) "'Commerce should assume that any imports from market-economy countries are not valued at 'reliable' market values, absent evidence that such values are otherwise consistent with world-market prices,'" id.;

(3) "'[Commerce's] current approach . . . in effect ignor[es] the market distortions that NME methodology is designed to address,'" id. at 29-30 (quoting Timken's Reply Pub. Doc. 132); and (4) "'[t]he statue does not compel Commerce to use factor values that are unreliable or unrepresentative of market economy prices.'" Id. at 30 (quoting Timken's Reply Pub. Doc. 132, emphasis omitted). Moreover, at the administrative level, counsel for Timken "explained that [Commerce] was required to test every factor value and repeatedly requested that [Commerce] rethink its regulation." Timken's Reply at 30 (emphasis omitted).

The Court, therefore, concludes that Timken properly exhausted its administrative remedies and has the right to raise this issue to the Court.

The Court disagrees with Timken's argument that since Commerce did not use the mode of examination offered by Timken on the issue, that is, whether the price paid by a PRC bearing manufacturer to a market-economy supplier was market-driven or representative of market-prices, Commerce's determination to value certain steel inputs by using the price paid by the PRC bearing producer was contrary to 19 U.S.C. § 1677b(c)(1) and unsupported by substantial evidence.

First, the Court is not persuaded by Timken's reliance on the CAFC's decision in Delverde, 202 F.3d 1360, for the proposition

that this Court should disapprove Commerce's determination that the PRC bearing producer's import price constituted the "best available information" to value the steel sheet at issue because, "[a]nalogously to what [Commerce] did in Delverde, [Commerce in the case at bar] simply presumed that the import price[] w[as] the 'best' information without testing the facts in any way, much less producing evidence to support [Commerce's] finding of fact." Timken's Reply at 16. As the Court in Lasko Metal, 16 CIT at 1081, 810 F. Supp. at 317, stated: "[T]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country." 16 CIT at 1081, 810 F. Supp. at 317 (emphasis supplied).

> "[W]here we can determine that a [non-market economy] producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law."

Shakeproof, 268 F.3d at 1382 (emphasis in original) (quoting Lasko, 43 F.3d at 1446); accord Oscillating Fans, 56 Fed. Reg. at 55,275.

Therefore, the cost for raw materials from a market-economy supplier, paid in convertible currency, constitutes an alternative market-driven price for the purpose of valuation.

In the case at bar, Commerce determined that the import price paid by a PRC bearing producer in market-economy currency to a

market-economy supplier represented the "best available information" to value the steel sheet at issue. Commerce reasoned:

> In accordance with [Commerce's] established practice and [Commerce's] regulations, [Commerce is] continuing to use the actual prices of directly imported steel to value steel inputs because these prices represent the actual market-based prices incurred in producing the subject merchandise and, as such, are the most accurate and appropriate values for this particular factor for the purpose of calculating NV. As noted by the respondents, this practice has been affirmed in court decisions, such as <u>Lasko</u>, [43 F.3d 1442] and is codified in [Commerce's] regulations at section 351.408(c)(1).

<u>Final Results</u>, 64 Fed. Reg. at 61,844-45.

The Court finds that Commerce's determination to value certain steel inputs by using the price paid by a PRC bearing producer to a market-economy supplier is reasonable and is in accordance with 19 U.S.C. § 1677b(c)(1) and 19 C.F.R. § 351.408(c)(1). <u>See</u> <u>Peer Bearing</u>, 25 CIT at __, 182 F. Supp. 2d at 1305 ("'In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable'" (quoting <u>Timken 1999</u>, 23 CIT at 516, 59 F. Supp. 2d at 1377)); <u>see also</u> <u>Chevron</u>, 467 U.S. at 844-45, and <u>Skidmore</u>, 323 U.S. at 139-40.

Second, the Court disagrees with Timken's argument that Commerce unreasonably allocated the burden of proof to Timken to show that the import data Commerce used to value certain steel inputs was unrepresentative of market-economy forces. As Commerce correctly notes, "Commerce does not err when it requires parties to

substantiate their views with record evidence as opposed to mere

speculation." Def.'s Mem. Partial Opp'n Timken at 33 (citation

omitted).

> During the POR, Commerce stated:
>
> [Commerce] disagree[s] with [Timken] that imports into
> China are unreliable indicators of market values because
> China's domestic market is distorted by government
> intervention. While China's NME status indicates that
> domestic prices in China are unreliable, there is no
> evidence that domestic distortions impact the price at
> which market-economy suppliers would offer products for
> sale to Chinese producers. [Commerce] ha[s] no reason to
> assume that, when dealing with Chinese importers, market-
> economy suppliers ignore rules of supply, demand, and
> profit-seeking behavior within a competitive world
> market.

Final Results, 64 Fed. Reg. at 61,845.

> Commerce observed:
>
> Even if [Commerce] were to accept [Timken's] argument
> that excess steel supply in China leads foreign
> competitors to "dump" steel on the Chinese market,
> [Timken] has not presented evidence that there is an
> excess supply of the particular type of steel used in the
> production of TRBs nor evidence that such excess supply
> somehow renders the steel prices being offered to certain
> Chinese TRB producers by market-economy suppliers
> unreliable. There are a variety of reasons for setting
> a particular price higher or lower than a world benchmark
> in an arm's length transaction. In examining actual
> sales between private parties, [Commerce] would have to
> be convinced by evidence on the record that the
> particular sale in question was in some way
> unrepresentative of market-economy forces. For example,
> [Commerce] would be willing to disregard a price paid by
> an NME producer to a market-economy supplier if the
> quantity of the input purchased in a given transaction
> is, for example, less than the volume that would normally
> be traded. Where the transaction is not in commercial
> quantities, the price may not be truly representative of

a market price.

Id.

Moreover, with respect to Timken's generalization that "Chinese bearing producers are [not] paying world market prices for imported inputs," Timken's Mem. at 27 (emphasis omitted), the Court finds that Timken's arguments amount to mere speculation. Similarly, with regards to Timken's contention that Timken "amply rebutted [Commerce's] presumption" that the import data constituted the "best available information" to value the steel sheet at issue, Timken's Reply at 21, the Court is unconvinced. The Court holds that Commerce did not unreasonably allocate the burden of proof to Timken to show that the import data Commerce used to value certain steel inputs was unrepresentative of market-economy forces.

Finally, the Court disagrees with Timken's arguments that: (1) "as [Commerce] evaluates market-economy prices to determine whether they are reliable in a market-economy case, [Commerce] should [use the same mode to] evaluate those prices to determine whether they are reliable in [an] NME case,"[27] Timken's Mem. at 33-34; and (2)

---

[27] Market-economy cases and non-market economy cases are distinct. See, e.g., Shakeproof, 268 F.3d at 1379 n.1. ("The [NV] of goods in 'market economy' cases is generally the price at which the foreign product is first sold in the exporting country. . . . [T]he normal value of goods in [NME] may be instead determined by looking at the 'factors of production' used to manufacture the goods," (citations omitted)); see also Lasko, 43 F.3d at 1445 ("[I]f [Commerce] cannot determine [NV] pursuant to the general

(continued...)

Commerce was obligated to examine the volume and frequency of Luoyang's market-economy purchases. <u>See</u> <u>Timken Co.</u>, 26 CIT at __, 201 F. Supp. 2d at 1337 (citing <u>Final Results of Antidumping Duty Administrative Review of Certain Helical Spring Lock Washers From the People's Republic of China</u>, 62 Fed. Reg. 61,794, 61,796 (Nov. 19, 1997), and <u>Final Rule</u>, 62 Fed. Reg. at 27,366, and stating that "[a]s Commerce correctly notes, . . . it is [Commerce's] practice to consider the volume of market-economy purchases for purposes of determining whether to value domestically-purchased inputs based upon the value of imports from a market-economy country").

Accordingly, the Court affirms Commerce's decision to value certain steel inputs by using the price paid by a PRC producer to a market-economy supplier.[28]

---

[27](...continued)
provisions of [19 U.S.C.] § 1677b(a), then [Commerce] must use the [FOP] methodology to <u>estimate</u> [NV] for the merchandise in question" (emphasis in original)).

[28] Timken provided the Court with a letter dated January 8, 2001, indicating, among other things, that the 12th Administrative Review's <u>Issues and Decision Memo for the 1998-99 Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results</u> and the <u>Allegation of Unfair Steel Prices</u> memorandum, "suggest[s] . . . that [Commerce] ha[s] taken a new position respecting the use of actual market-prices in calculating Chinese values." Timken's January 8, 2001, letter (citing Exs. 2 at 3-8 and 3). The Court is not persuaded by Timken's argument. <u>See generally</u>, <u>Hoogovens Staal BV v. United States</u>, 22 CIT 139, 144, 4 F. Supp. 2d 1213, 1218 (1998) (stating that "[w]hatever additional information that persuaded Commerce that [the plaintiffs] had discontinued [their] practice . . . during [the subsequent] period of review was not a

(continued...)

### 2. Commerce's Decision to Value the Entire FOP by Using the Price Paid by a PRC Bearing Producer

In applying the FOP methodology to an NME, if Commerce finds that actual costs represent the "best available information," Commerce has the discretion to take a combined approach and to consider actual costs paid by the NME producer for each FOP. See Lasko, 43 F.3d at 1445-46; Magnesium Corp. of Am. v. United States, 20 CIT 1092, 1098, 938 F. Supp. 885, 892 (1996). The statute does not specify what constitutes "best available information," nor does it prescribe a specific method for valuing FOP when a portion of the factor to be valued represents a source in the NME itself and a portion of the same FOP represents a source obtained from a market-economy supplier and paid for in market-economy currency.

Moreover, the relevant regulation provides:

> [Commerce] normally will use publicly available information to value factors. However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, [Commerce] normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, [Commerce] normally will value the factor using the price paid to the market economy supplier.

19 C.F.R. § 351.408(c)(1).

---

[28](...continued)
part of the record for this review," and "Commerce correctly based its decision on the information in the record").

In the case at bar, Commerce used the PRC producer's import data, rather than surrogate data, to value the entire FOP (that is, both the directly imported FOP and the NME sourced FOP). See Final Results, 64 Fed. Reg. 61,844. Commerce, however, admittedly failed to "explain [in the Final Results, 64 Fed. Reg. 61,844-45,] why the imports in question were meaningful." Def.'s Mem. Partial Opp'n Timken at 39.

As a preliminary matter, the Court finds that Timken exhausted its administrative remedies and has the right to raise the issue of Commerce's failure to determine whether the imports in question were meaningful because Timken sufficiently provided Commerce with an opportunity to address this issue when Timken in its case brief argued that "Commerce should not assign the Chinese imported steel values to a larger volume of steel inventory than such purchases actually represent." Def.'s Mem. Partial Opp'n Timken, App. Ex. 7 at 24 (proprietary version) (emphasis omitted); see also supra Discussion Part IV, C1 (Analysis).

Commerce's failure to address whether the import data at issue was meaningful, however, prevents the Court from reviewing the issue of Commerce's decision to value the entire FOP (that is, both the directly imported FOP and the NME sourced FOP) intelligibly. In the commentary accompanying the promulgation of 19 C.F.R. § 351.408(c)(1) Commerce states that:

[Commerce] would not rely on the price paid by an NME producer to a market economy supplier if the quantity of the input purchased was insignificant. . . . [T]he amounts purchased from the market economy supplier must be <u>meaningful</u>. . . .

<u>Final Rule</u>, 62 Fed. Reg. at 27,366 (emphasis supplied).

Similarly, with respect to Timken's argument that Commerce's decision to use a PRC producer's import data to value other purchases (that is, the NME sourced FOP) without "explain[ing] why [the] import [data was] more accurate (or 'meaningful') than surrogate-country values," Timken's Reply at 28, the Court finds that while the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute," <u>Suramerica</u>, 966 F.2d at 665, it was illogical for Commerce to utilize a PRC bearing producer's import data to value the entire FOP (that is, both the directly imported FOP and the NME sourced FOP) without explaining why analogously structured PRC trading company data could not be used as a surrogate value.

Based on the foregoing, the Court remands this issue to Commerce with instructions to: (1) explain, with reference to the record, whether or not the PRC bearing producer's import data at issue was "meaningful"; and (2) provide the Court with an explanation as to why the PRC trading company data is not the "best

available information" for the purpose of valuing either the entire

FOP (that is, both the directly imported FOP and the NME sourced

FOP) or the NME sourced FOP.


**V.    Commerce's Reliance on Six Indian Producers' Reported Data in
       Commerce's Determination of Overhead, Selling, General and
       Administrative Expenses and Profit Rates**

   **A.    Background**

   Section 1677b(c)(1) of Title 19 requires Commerce to "deter-

mine the [NV] of the subject merchandise on the basis of the value

of the [FOPs] utilized in producing the merchandise and to which

shall be added an amount for general expenses and profit plus the

cost of containers, coverings, and other expenses."  General

expenses are the expenses that do not bear a direct relationship to

the production of the merchandise at issue, such as SG&A expenses.

The subsection also states that the valuation of FOPs "shall be

based on the best available information regarding the values of

such factors in a market economy country or countries considered to

be appropriate by [Commerce]."  Id.  Section 1677b(c)(4) provides

that, in valuing FOPs under paragraph (1) of § 1677b(c), Commerce

"shall utilize, to the extent possible, the prices or costs of

[FOPs] in one or more market economy countries. . . ."

   Moreover, the relevant regulation provides

      [f]or manufacturing overhead, general expenses, and
      profit, [Commerce] normally will use non-proprietary

information gathered from producers of identical or
comparable merchandise in the surrogate country.

19 C.F.R. § 351.408(c)(4) (1998).


In the Preliminary Results, Commerce used "information
obtained from the fiscal year 1997-98 annual reports of six Indian
bearing producers" as surrogate values for factory overhead, SG&A
and profit.[29]  64 Fed. Reg. at 36,856; see also Def.'s Mem. Partial

---

[29]  In Commerce's June 30, 1999, decision memorandum discussing
the FOP values used for the Preliminary Results, 64 Fed. Reg. at
36,856, Commerce stated:

> To calculate surrogate values for factory overhead and
> SG&A, [Commerce] first categorized all of the non-direct
> expenses (excluding labor) of six Indian bearings
> producers, as reported in their 1997-98 annual reports,
> as either overhead or SG&A, as appropriate. [Commerce]
> ha[s] excluded the data for Asian Bearings ["Asian"] and
> [National Engineering Company] ["]NEI["] in calculating
> surrogate overhead, SG&A and profit ratios primarily
> because, according to the Auditor's Reports, the
> methodology used in recording and reporting the financial
> condition of these two companies appears, in certain
> instances, to be inconsistent with the methodology (i.e.,
> Indian GAAP) used by the remaining five companies.  Given
> these significant differences, it would be incongruous to
> combine the reported data of all seven companies.

Def.'s Mem. Partial Opp'n Timken, App. Ex. 3 at 4-5.

Additionally, Commerce in its brief states with respect to
NEI's annual report that

> Note 11 to the auditors' report provided that "[n]o
> provision has been made for Doubtful debts & advances
> aggregating Rs 183.65 lacs (Previous year Rs 149.37
> lacs)."  Note 22 to the auditors' report provided that
> "[t]he Company has not made provision for the Leave
> liability of employees (amount unascertained) and the
> same as per consistent practice will be accounted for as

(continued...)

Opp'n Timken, App. Ex. 3.

> Specifically, Commerce
>
> calculated factory overhead and [SG&A] expenses
> (exclusive of labor and electricity) as percentages of
> direct inputs (also exclusive of labor) and applied these
> ratios to each producer's direct input costs.  For
> profit, [Commerce] totaled the reported profit before
> taxes for the six Indian bearing producers and divided it
> by the total calculated cost of production ("COP") of
> goods sold.  This percentage was applied to each
> respondent's total COP to derive a company-specific
> profit value.

Preliminary Results, 64 Fed. Reg. at 36,856.

In the Final Results, during the review at issue, Commerce

continued to use data from only six of the Indian bearing producers

and excluded data from Asian and NEI by stating:

> [Commerce] disagree[s] with [Timken] and has[s] excluded
> the data for Asian Bearing and NEI in calculating
> surrogate overhead, SG&A and profit ratios because,
> according to the Auditor's Reports, the methodology used
> in recording and reporting the financial condition of
> these two companies appears, in certain instances, to be
> inconsistent with the methodology (i.e., Indian GAAP)
> used by the remaining six companies.

---

[29](...continued)
and when paid."

Def.'s Mem. Partial Opp'n Timken at 6 (quoting Def.'s Mem. Partial
Opp'n Timken, Proprietary App. Ex. 5 (NEI Annual Report) at 26 and
27)); see also Def.'s Mem. Partial Opp'n Timken, Proprietary App.
Ex. 5 (NEI Annual Report) at 11.

In this review, the Auditor's Report included with Asian Bearing's 1997-98 financial statements expresses a clear reservation about how certain interest expenses (with their corresponding effects on depreciation and other expenses) have been reported, noting that the methodology is not in accordance with accounting principles recommended by the Institute of Chartered Accountants of India.  The Auditor's Report also notes that Asian Bearing continues to be a "sick" company as defined by India's Sick Industrial Companies Act.  Likewise, the auditors' endorsement of NEI's 1997-98 Financial Statements, as contained in the Auditor's Report, includes qualifications regarding the company's treatment of various overhead and SG&A expenses.  As in [the 10th Annual Review, 63 Fed. Reg 63,842], the qualifications indicate that the treatment of these expenses is not consistent with Indian GAAP.

Given these significant differences, it would be incongruous to combine the reported data of all eight companies.

Final Results, 64 Fed. Reg. at 61,842-43.


## B.    Contentions of the Parties

### 1.    Timken's Contentions

Timken alleges that Commerce's exclusion of NEI from the calculation of overhead, SG&A, and profit ratios "was arbitrary and unreasonable."[30]  Timken's Mem. at 40.  In particular, Timken argues that Commerce "offered no reason and pointed to no facts that would justify the exclusion of NEI data from the overhead, SG&A, and

---

[30]    The Court notes that, in this case, Timken is not contesting Commerce's exclusion of Asian from the calculation of overhead, SG&A, and profit ratios but only the exclusion of NEI.  See Timken's Mem. at 5 n.4; see also Timken's Mem. at 37-40 and Timken's Reply at 32-35.

profit ratios." Id. at 38. Timken maintains that: (1) "a comparison of NEI's overhead, SG&A, and profit ratios with the other six companies shows ratios that are well within the range of other Indian bearing producers," id. at 38 (citing Timken's Mem. at 19, Table 4); (2) NEI's annual report was audited and approved by Chartered Accountants in India, see Timken's Mem. at 19; and (3) "the Auditor's Report reveals only inconsequential omissions," id. at 20.

Timken further argues that "the aggregate annual report data of all seven Indian bearing producers would have been more descriptive of the variety of companies in China than the data of only six producers . . . ," id. at 40, and "the record included the figures necessary to make NEI's annual report data GAAP-compliant." Id. at 39. Timken contends, for example, that since NEI's leave data was not provided for in NEI's annual report, Commerce could have "based the profit ratio on an average labor cost of the other six Indian bearing companies or relied on another company's leave data." Timken's Reply at 34.

Finally, Timken asserts that "[a]s there is no evidence that NEI's overhead or SG&A ratios were affected by its accounting methodologies, [Commerce] should at least have used the NEI's data for those factors as the best available information for Indian

bearing producers."  Timken's Reply at 34 (citing 19 U.S.C. §
1677b(c)(1)).


### 2.    Commerce's Contentions

Commerce responds that it properly used data from only six of
the Indian bearing producers and excluded the annual report data
contained in NEI when calculating the ratios for overhead, SG&A and
profit.  See Def's Mem. Partial Opp'n Timken at 40-42.  Commerce
explained that it rejected NEI's annual report data because

> "the auditors' endorsement of NEI's 1997-98 Financial
> Statements, as contained in the Auditor's Report,
> includes qualifications regarding the company's treatment
> of various overhead and SG&A expenses."  These
> qualifications reveal that NEI made no provision for
> doubtful debts and advances or for the leave liability of
> employees. . . .  Commerce found these qualifications to
> be significant because they were inconsistent with Indian
> generally accepted accounting principles ("GAAP")
> utilized by the other six companies.

Id. at 41 (quoting Final Results, 64 Fed. Reg. at 61,842).


Moreover, relying on Writing Instrument, 21 CIT at 1195, 984
F. Supp. at 639, Commerce argues that "in determining whether a
surrogate value represents the best available information, Commerce
is authorized to determine the reliability of that value and, if it
is established that the value is unreliable, decline to use that
data for purposes of factor valuation."  Def.'s Mem. Partial Opp'n
Timken at 41.

**C.    Analysis**

The Court finds that Commerce acted reasonably within its discretion in excluding the annual report data contained in NEI when calculating the ratios for overhead, SG&A and profit.  In particular, Commerce pointed out that it rejected NEI's annual report data because

> "the Auditor's Report [of NEI's Financial Statements] includes qualifications regarding the company's treatment of various overhead and SG&A expenses."  These qualifications reveal that NEI made no provision for doubtful debts and advances or for the leave liability of employees. . . .  Commerce found these qualifications to be significant because they were inconsistent with Indian generally accepted accounting principles ("GAAP") utilized by the other six companies.

Id. at 41 (quoting Final Results, 64 Fed. Reg. at 61,842).

This Court is not in a position to declare such a conclusion unreasonable.  See Chevron, 467 U.S. at 844-45, and Skidmore, 323 U.S. at 139-40; see also Timken Co., 26 CIT at __, 201 F. Supp. 2d at 1346 (finding that "Timken may not usurp Commerce's role as fact finder and substitute their analysis for the result reached by Commerce").

Accordingly, the Court sustains Commerce's determination to use the annual report data of six Indian bearing producers as a surrogate for determining overhead, SG&A and profit rates as reasonable, in accordance with law and supported by substantial evidence.

**CONCLUSION**

This case is remanded to Commerce to: (1)(a) examine whether or not the PRC trading company import prices constitute the "best available information" to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and used by Luoyang in the manufacture of TRB cups and cones and, if Commerce concludes that the PRC trading company import prices present the "best available information" for the purpose of such surrogate evaluation, to recalculate Commerce's determination not inconsistent with this opinion; and (b) examine if, and only if, Commerce finds that the PRC trading company import prices do not constitute the "best available information," whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones, and to explain, (if Commerce finds that export data from Japan to India is the "best available information,") how the entire export data from Japan to India falls within the range of values in the United States category benchmark range; (2) exclude "consumption of traded goods" from Commerce's overhead, SG&A and profit rate calculations and to recalculate the dumping margins accordingly; and (3) (a) explain, with reference to the record,

whether or not the PRC bearing producer's import data at issue was "meaningful"; and (b) provide the Court with an explanation as to why the PRC trading company data is not the "best available information" for the purpose of valuing either the entire FOP (that is, both the directly imported FOP and the NME sourced FOP) or the NME sourced FOP. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    October 1, 2002
          New York, New York